**60 P.(2d) 646**

**STATE v. ROY.**

**No. 4118.**

Supreme Court of New Mexico.

July 21, 1936.

Rehearing Denied Aug. 12, 1936.

G. W. Robertson, of Raton, and M. C. Mechem, of Albuquerque, amici curiæ.

D. A. Macpherson, Jr., and A. H. McLeod, both of Albuquerque, for appellant.

Frank H. Patton, Atty. Gen., and Quincy D. Adams and Edward P. Chase, Asst. Attys. Gen., for the State.

ZINN, Justice.

This case involves the life of Hyman Roy, who was tried and convicted for the murder of Martha Hutchinson. He was sentenced to the electric chair. The case is here on appeal.

On September 20, 1934, one Joe Browning and Martha Hutchinson, both colored, drove in front of the gasoline tanks of a garage in Albuquerque, N. M., and as their car came to a stop another car driven by the defendant (appellant here), also colored, came opposite the first car. Defendant, using a revolver, shot and killed Joe Browning. Martha Hutchinson ran into the garage, and the defendant fired at her as she ran. The defendant followed her into the garage, where he found her behind some oil barrels, and fired a number of shots into her back from which she died.

Ten points are assigned for the consideration of this court as follows:

First. That chapter 84 of the Laws of 1933 is unconstitutional in that it delegates legislative powers to the judiciary.

Second. That the information used in this case is inherently defective and insufficient and the conviction accordingly illegal and void.

Third. That the court erred in denying the defendant a continuance.

Fourth. That the court erred in fixing the date of execution at a date prior to the full term allowed for appeal.

Fifth. That there was evidence in the record that the defendant was insane, and the court erred in refusing a requested instruction on insanity.

Sixth. That the court erred in refusing to allow the defendant to elicit from a witness testimony which would show certain actions and peculiarities on the part of the defendant. This relates to the defendant's attempted insanity defense.

Seventh. That the court erred in allowing a witness to testify to a conversation had over the telephone with the defendant.

Eighth. That the court erred in not instructing the jury to disregard certain statements which defendant claims the district attorney injected into the record and which the defendant urges were highly prejudicial to him.

Ninth. That the court erred in allowing a witness, over the objection of the

defendant, to testify to another crime by the defendant.

Tenth. That the giving by the court of a certain instruction was error.

We will briefly dispose of the latter eight assignments of error in the order of their presentation, reserving the first two for final discussion and disposition.

■ Beginning with the third point: The defendant was given a preliminary hearing on September 24, 1934. The September, 1934, term of the district court of Bernalillo county had then started. The case was set for trial on October 8, 1934. On motion of defendant the trial was continued until October 11, 1934, at which time the defendant filed a motion for continuance until the March, 1935, term. This motion was denied.

The defendant contends that the trial court erred in so ruling on the motion. It is the defendant's theory that the provisions of Comp.St.1929, § 79-804, are mandatory. This section provides that if at a preliminary hearing before a committing magistrate it appears to such magistrate that there is probable cause to believe the accused guilty, it becomes the duty of the magistrate by recognizance to "summon the prosecutor and all material witnesses against the prisoner, to appear and testify before the court having cognizance of such offense, on the first day of the next term thereof, and not to depart from such court without leave." The defendant claims that pursuant to this statute he could not be tried until the next term after the September, 1934, term (which is the March, 1935, term), and therefore the motion for continuance ought to have been granted.

Section 79-804 in no manner governs the rights of one accused of crime to a continuance. Section 79-804 is a chart to guide committing magistrates in some of their duties at a preliminary hearing. The defendant, having appeared before the trial court and moved orally for a continuance, which was granted to October 11, 1934, cannot now be heard to complain of the refusal of the trial court to grant an additional continuance without a showing of sufficient cause for such continuance.

■ The fourth assignment of error is likewise without merit. The sentence of death against the defendant was entered on October 23, 1934.

The order provided that the defendant be executed on January 5, 1935. The statute (Comp.St.1929, § 35-321) provides that a warrant of execution upon judgment of death must set a date which must be not less than sixty nor more than ninety days from the date of judgment within which time the prisoner must be executed. The time within which an appeal from such judgment must be taken pursuant to trial court rules is ninety days. Rule 105-2501; Comp.St.1929, § 105-2526.

The fact that the defendant's execution was ordered at a day which compelled him to take his appeal before the ninety-day period had elapsed does not invalidate the

judgment and sentence because of the alleged inconsistency between the statute and rule. Comp.St.1929, § 35-323, provides that the execution may be suspended if an appeal is taken. In the instant case an appeal was taken, granted, and an order entered and filed on December 19, 1934, staying the execution. The appeal was perfected, the execution stayed, and the defendant, we assume, is still alive. He has not been prejudiced and cannot complain.

As to the fifth assignment of error, the trial court did not err in refusing to give an instruction on insanity as requested by the defendant.

A witness testified on direct examination that after the demise of the defendant's wife, the defendant became a changed man, in that the defendant "was polluted half the time or crazy or something, I don't know what was the matter with him." This witness also testified that after the loss of defendant's wife and son, the defendant "came over to church a time or two, he cried around about it, he would just cry about it, go on about it, he wasn't at himself." We assume the crying was induced by an emotional state in the nature of grief resulting from the loss to the defendant of his wife and son. On cross-examination this witness testified that the defendant after losing his wife and son "went on quite a bit about it and a longer period than I thought he should, for several months." This witness thought that the defendant should have forgotten the loss sooner.

Another lay witness testified that about noon of the day of the homicide the defendant "looked kind of wild in his eyes * * * just looked something out of the ordinary; figgety, like."

The above-narrated evidence, if believed by the jury, does not tend to show that the defendant was insane to such an extent as to excuse the defendant from the legal consequences of his act. Sanity is the normal condition of man and insanity an abnormal state. In the absence of anything to the contrary, the presumption is that the defendant is sane and is criminally responsible for his act. 8 R.C.L. 175.

A plea of insanity by one accused of the commission of a crime may be likened to a plea of confession and avoidance in a civil action. The defendant admits that he committed the act or acts charged against him, but seeks to avoid a judgment or penalty on account of such act or acts, and to absolve himself from liability, on a sound legal theory.

In a criminal case the prosecutor may rest upon the presumption of sanity in establishing a prima facie case. It is then incumbent upon the defendant to overcome that presumption by competent evidence and to reasonably substantiate his plea of insanity. Such evidence must reasonably tend to show that at the time of the commission of the crime the defendant was incapable of distinguishing right from wrong

so as to excuse him from the legal consequences of his act.

Stated another way: The state is obliged to establish the defendant's guilt beyond a reasonable doubt. Crimes involving a guilty intent cannot be successfully prosecuted against one charged who is insane, because an insane person does not have the capacity to form a criminal intent. Therefore, the burden of proof is upon the state to prove that the defendant is sane beyond a reasonable doubt. In the first instance, this burden is met or satisfied by the presumption that the defendant is sane.

It then becomes the duty of the defendant and upon him is the onus or burden of going forward with evidence to overcome this presumption.

When the defendant has put in evidence reasonably tending to show him insane, the problem is then to determine whether it is sufficient to take the case to the jury. This is a question for the court to determine. Therefore, when all the evidence is in, if there has been adduced competent evidence reasonably tending to support the fact of insanity urged by the defendant as a defensive issue in the case, it is the duty of the court to instruct on the question of insanity. Otherwise, the court may properly refuse such instruction. 14 R.C.L. pp. 799-800, § 58; State v. Martinez, 30 N.M. 178, 230 P. 379.

We have not departed from the "right and wrong test" as established in the famous McNaughten Case, 10 Clark & F. 199, 8 Eng. Reprint, 718, which is the generally accepted doctrine of the English and American courts. The capacity of the accused to distinguish right from wrong in respect to the act charged as a crime at the time of its commission is made the test of his responsibility.

No evidence was offered by the defendant to show that at the time of the commission of the crime with which he is charged he was unable to distinguish right from wrong. The mere fact that he was grief-stricken over the loss of his wife and son which caused him to go to church a time or two and weep and become "polluted half the time" is not evidence justifying the submission to the jury of the question of the defendant's insanity. This is likewise true as to testimony that the defendant had a "wild look" in his eye just before he committed the crime.

Witness Austin, assuming that his opinion was admissible under the rule laid down in Territory v. McNabb, 16 N.M. 625, 120 P. 907, admitted that he did not know what was wrong with the defendant. Witness Dixon testified that the defendant had a "wild look" in his eye. No proof of insanity within legal contemplation being offered, the trial court properly refused the requested instruction. 13 R. C.L. 712.

In the case of Maulding v. Commonwealth, 172 Ky. 370, 189 S.W. 251, 255, the defendant complained of the court's refusal to instruct on insanity. The offered evidence was even stronger than in

the instant case. The Court of Appeals of Kentucky sustained the trial court's refusal to instruct, and cited with approval from an earlier Kentucky case, which statement of the law we deem sound and applicable here: "There is no law which will excuse or palliate a deliberate murder on the ground that the perpetrator of it is unlearned, passionate, ignorant, or even of weak mind, unless the weakness of mind amounts to such a defect of reason as to render him incapable of knowing the nature and quality of his act, or, if he does know it, that he does not know it is wrong to commit it. It is no excuse for murder that the perpetrator has not power to control his actions when aroused or in a passion. It is the duty of men who are not insane or idiotic to control their evil passions and violent tempers or brutal instincts, and if they do not do so, it is their own fault, and their moral and legal responsibility will not be destroyed or avoided by the existence of such passions, or by their conduct resulting from them." Bast v. Commonwealth, 124 Ky. 747, 99 S.W. 978, 30 Ky.Law Rep. 967.

In the instant case, the defendant having failed to produce evidence reasonably tending to establish the fact of insanity, he was not entitled to have the law on the subject declared by the court or to have the issue of insanity submitted to the jury.

As to the sixth assignment of error, predicated upon the refusal of the trial court to permit certain witnesses to answer questions propounded to them in an attempt to show that the defendant was of a peculiar nature, we are compelled to rule against the defendant. We cannot tell from the record whether the defendant was prejudiced. The record is silent as to what the evidence would have been if not excluded by the court on objection of the prosecution. The defendant failed to make a tender of the testimony which he expected to elicit from the witnesses. State v. Fernandez, 37 N.M. 151, at page 155, 19 P.(2d) 1048, and cases cited.

The seventh assignment relates to a threat which the defendant made against the deceased and which he communicated by telephone to the sister of the deceased. This evidence the court admitted in evidence over objection. The defendant assigns error because he claims this threat was made four or five weeks before the homicide and was too remote. This is not too remote in point of time. The assignment is without merit.

We cannot consider the eighth assignment of error because the defendant failed to invoke a ruling below.

The ninth and tenth assignments of error will be considered together.

The defendant complains of the admission of evidence which related to the shooting of Browning, as such testimony tended to show the commission of another crime by the defendant. The defendant also claims that the court erred in giving instruction No. 11, in substance directing the jury that it might consider the evidence

relating to the killing of Browning as proving the intent of the defendant and also to prove the absence of mistake or accident.

The testimony relating to the killing of Browning just prior to the killing of Martha Hutchinson was admissible, and the court's instruction respecting the same was proper. Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish: (1) Motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. State v. Starr, 24 N. M. 180, 173 P. 674.

The killing of Browning was committed at about the same time and so connected with the killing of Martha Hutchinson that one could hardly be shown without the other, and clearly proves the murderous intent of the defendant, and the absence of any mistake or accident.

This brings us back to the first and second assignments of error, which we shall treat in inverse order.

The defendant was informed against under the short form of information allowed by rule 35-4407 of the trial court rules adopted by this court.

The charging part of the form of information used by the prosecution is as follows: "That Hyman Roy late of the County of Bernalillo in the State of New Mexico, now in this forum here held to answer for the crime charged herein after having had a preliminary examination therefor before an examining magistrate, on the 24th day of September in the year of our Lord one thousand nine hundred and thirty-four, at the County of Bernalillo in the State of New Mexico, aforesaid, on, to-wit: the 20th day of September, 1934, at the County of Bernalillo, State of New Mexico, then and there being, did murder Martha Hutchinson, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of New Mexico."

The trial court rules under which this information was presented were promulgated by this court, and became effective on July 1, 1934. These rules were promulgated subsequent to the enactment by the Legislature of chapter 84 of the Law of 1933, being an act relating to rules of pleading, practice, and procedure in the courts of the state of New Mexico. The act is in two sections, reading as follows:

"Section 1. The Supreme Court of the State of New Mexico shall, by rules promulgated by it from time to time, regulate pleading, practice and procedure in judicial proceedings in all courts of New Mexico, for the purpose of simplifying the same and of promoting the speedy determination of litigation upon its merits. Such rules shall not abridge, enlarge or modify the substantive rights of any litigant. The Supreme Court shall cause such rules to be printed and distributed to all

members of the bar of the State of New Mexico and to all applicants, and the same shall not become effective until thirty days after they have been so printed, made ready for distribution and so distributed.

"Sec. 2. All statutes relating to pleading, practice and procedure, now existing, shall, from and after the passage of this Act, have force and effect only as rules of court and shall remain in effect unless and until modified or suspended by rules promulgated pursuant hereto."

Whether trial court rule 35-4407 (and all other trial court rules) was promulgated and adopted by this court by the alleged delegation of authority of the aforesaid chapter 84, or in the exercise of the inherent power of the judiciary to provide rules of pleading, practice, and procedure in the courts of New Mexico, will be discussed later. For the purpose of disposing of the assignment of error now under consideration, it is assumed that the rules were validly adopted either under the inherent powers of this court or by virtue of an assumed delegation of authority as the result of the enactment of chapter 84.

The provisions of the rules so adopted and which are pertinent to a discussion of the point under consideration, and their context, are as follows:

Rule 35-4408 provides:

"*Charging the offense.* (1) The indictment or information may charge, and is valid and sufficient if it charges, the offense for which the defendant is being prosecuted in one or more of the following ways:

"a. By using the name given to the offense by the common law or by a statute.

"b. By stating so much of the definition of the offense, either in terms of the common law or of the statute defining the offense or in terms of substantially the same meaning, as is sufficient to give the court and the defendant notice of what offense is intended to be charged.

"(2) The indictment or information may refer to a section or subsection of any statute creating the offense charged therein, and in determining the validity or sufficiency of such indictment or information regard shall be had to such reference."

Rule 35-4409 provides in part:

"*Bills of Particulars.* (1) When an indictment or information charges an offense in accordance with the provision of section 35-4408, but fails to inform the defendant of the particulars of the offense sufficiently to enable him to prepare his defense, or to give him such information as he is entitled to under the Constitution of this state, the court may, of its own motion, and shall, at the request of the defendant, order the district attorney to furnish a bill of particulars containing such information as may be necessary for these purposes; or the district attorney may of his own motion furnish such bill of particulars."

"(5) When any bill of particulars is furnished it shall be filed of record and a copy of such bill given to the defendant upon his request."

Rule 35-4414 provides:

"*Means.* An Indictment or information need contain no allegation of the means by which the offense was committed, unless such allegation is necessary to charge the offense under section 35-4408."

Rule 35-4417 in part:

"*Intent.* (1) An Indictment or information need contain no allegation of the intent with which an act was done, unless such allegation is necessary to charge the offense under section 35-4408."

Rule 35-4429 provides:

"*Meaning of words and phrases.* The words and phrases used in an indictment, information or bill of particulars are to be construed according to their usual acceptation, except that words and phrases which have been defined by law or which have acquired a legal signification are to be construed according to their legal signification."

Rule 35-4438 provides:

"*Offenses divided into degrees.* In an indictment or information for an offense which is divided into degrees it is sufficient to charge that the defendant committed the offense without specifying the degree."

Rule 35-4446 provides in part:

"*Forms for specific offenses.* The following forms may be used in the cases in which they are applicable:

"Murder.—'A. B. Murdered C. D.'"

Under these rules, it was not necessary to allege the means by which the murder was committed. Rule 35-4414. It was not necessary to allege a criminal intent. Rule 35-4417. The defendant was sufficiently apprised of the crime charged in accordance with rule 35-4408, subsection (a). The charge was in accord with the recommendations of this court. Rule 35-4446. The allegation, "Hyman Roy did murder Martha Hutchinson," is sufficient under rule 35-4429. Comp.St.1929, § 35-304, divides murder into degrees. Rule 35-4438 provides that an information for an offense which is divided into degrees need not specify the degree. It is readily seen that under the rules promulgated by this court the information is sufficient.

Upon request of the defendant, he was furnished a bill of particulars as provided by rule 35-4409, trial court rules, the material part of which bill of particulars is as follows: "* * * the said Martha Hutchinson was murdered by defendant with a gun, to-wit: a pistol, and that she was murdered, shot, and killed at and in the City of Albuquerque, New Mexico, at the date alleged in the Information filed herein; and the District Attorney shows further that he is prosecuting for and will request a conviction for murder in the first degree, or, in the alternative, for murder in the second degree."

The primary challenge of the defendant to the information is based on constitutional grounds. Defendant contends that

the form of information as used does not fully advise him of the crime he is charged with and will not protect him in the event of double jeopardy. The defendant also contends that the bill of particulars is no part of the information and cannot therefore cure a defective information. Furthermore, the defendant claims that the bill of particulars, even if it is a part of the information, is insufficient to meet the constitutional requirements as an accusation.

The defendant claims that the information in the instant case is violative of article 2, § 14, of the N.M.Const. Article 2, § 14, of the Constitution of New Mexico provides:

"No person shall be held to answer for a capital, felonious or infamous crime unless on a presentment or indictment of a grand jury or information filed by a district attorney or attorney general or their deputies. * * *

"In all criminal prosecutions, the accused shall have the right * * * to demand the nature and cause of the accusation."

This constitutional provision establishes the principle that trial for a felony must be preceded by a sworn accusation. This is one of the ancient immunities and privileges of English liberty. Under such constitutional provisions, as under the common law, a person accused of crime is entitled to be advised of the crime he is charged with by an indictment or presentment by a grand jury, or an information by a judicial officer representing the state.

This takes the form of a written pleading. Certain elements of an information became early established as indispensable, viz.: (1) A statement of the particular crime of which the defendant is accused; (2) a statement of the facts or act or acts done by the defendant constituting the crime. This was, and still is, the established law in this jurisdiction. In the case of State v. Gray et al., 38 N.M. 203, 30 P.(2d) 278, at page 281, decided March 13, 1934, before the adoption of the rules promulgating the short form of indictment and information, speaking through Mr. Justice Bickley, we quoted with approval the following: "Mr. Justice Waite, in the United States v. Cruikshank, 92 U. S. 542, 557, 23 L.Ed. 588, announced a rule for pleading in criminal cases, which is often quoted as follows: 'In criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right "to be informed of the nature and cause of the accusation." Amend. VI. In United States v. Mills, 7 Pet. [138] 142 (8 L.Ed. 636), this was construed to mean, that the indictment must set forth the offense "with clearness and all necessary certainty, to apprise the accused of the' crime with which he stands charged;" and in United States v. Cook, 17 Wall. [168] 174, 21 L.Ed. 538, that "every ingredient of which the offense is composed must be accurately and clearly alleged." It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, "includes gener-

ic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species—it must descend to particular." I Arch.Cr.Pr. and Pl. 291. The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances.' " However, in the same case we said: "It must be borne in mind that we do not have the short form of indictment or information for manslaughter, prescribed by statute, not pleading the unlawful act, as in Ohio for instance. See, for example State v. Schaeffer, 96 Ohio St. 215, 117 N.E. 220, L.R.A.1918B, 945, Ann. Cas.1918E, 1137. The Ohio Statute there cited (Gen.Code Ohio § 13583) is as follows: 'In an indictment for murder in the second degree or manslaughter, the manner in which, or the means by which the death was caused need not be set forth. It shall be sufficient in an indictment for murder in the second degree to charge that the defendant did purposely and maliciously, and for manslaughter that

the defendant did unlawfully, kill the deceased.' " This statement by Mr. Justice Bickley was in all probability a forecast of our present view.

 Let us consider the purpose of an accusation. We quote from the defendant's brief: "Surely it is elemental that every accused has a substantive right to be informed in simple, understandable language of the crime he is charged with and the acts constituting that crime, and in sufficient detail to enable him to prepare his defense, and to be protected in the event of double jeopardy." With this we agree.

There was a time in our jurisprudence when it required a master in the art of juggling words to frame an indictment or information. If the following words and phrases, to wit, "aforesaid," "did then and there," and "him the said," did not fall into their proper places in the indictment or information in sufficient quantity, the accusation was quashed, the prosecuting attorney dubbed as incompetent, and the accused freed, to the dismay of the public and the chagrin and mortification of reason.

Let us compare the charging part of the information in the instant case, as follows, "Hyman Roy * * * did murder * * * Martha Hutchinson," with the indictment in the case of State v. Wiley Freeman, 1 Speers, 57, decided by the Supreme Court of South Carolina in 1842, which is as follows:

"That Wiley Freeman, laborer, on the tenth day of April, in the year of our Lord one thousand eight hundred and thirty-seven, with force and arms, at Edgefield courthouse, in the district and State aforesaid, in and upon one Mary Freeman, in the peace of God and this State then and there being, feloniously, wilfully, and of his malice aforethought, did make an assault, and that the said Wiley Freeman, with a certain gun called a rifle gun, of the value of ten dollars, then and there charged with gun powder and two leaden bullets, which said gun he the said Wiley Freeman in both his hands then and there had and held, at and against the said Mary Freeman, then and there feloniously, wilfully, and of his malice aforethought, did shoot off and discharge, and that the said Wiley Freeman, with the leaden bullets aforesaid, by means of shooting off and discharging the said gun so loaded, to, at, and against the said Mary Freeman, as aforesaid, did then and there feloniously, wilfully, and of his malice aforethought, strike, penetrate and wound the said Mary Freeman, in and upon the left side of the said Mary Freeman, below the left breast of her the said Mary Freeman, giving to her the said Mary Freeman, then and there with the leaden bullets aforesaid, by means of shooting off and discharging the said gun so loaded, to, at, and against the said Mary Freeman, and by such striking, penetrating and wounding the said Mary Freeman, as aforesaid, one mortal wound in and upon the left side of the said Mary Freeman, below the left breast of the said Mary Freeman, of the depth of four inches, and of the width of one inch, of which said mortal wound the said Mary Freeman, on and from the said tenth day of April, in the year of our Lord one thousand eight hundred and thirty-seven, until the eleventh day of April, in the year of our Lord one Thousand eight hundred and thirty-seven, at Edgefield court house, in the district and State aforesaid, did languish, and languishing did live, on which said eleventh day of April last aforesaid, about the hour of five o'clock in the morning, she, the said Mary Freeman, at Edgefield court house, in the district and State aforesaid, of the mortal wound aforesaid died; and so the jurors aforesaid, upon their oaths do say, that the said Wiley Freeman, her, the said Mary Freeman, in manner and form aforesaid, feloniously, wilfully, and of his malice aforethought, did kill and murder, against the peace and dignity of the same State aforesaid.

"And the jurors aforesaid, upon their oaths aforesaid, do further present, that Wiley Freeman, labourer, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the tenth day of April, in the year of our Lord one thousand eight hundred and thirty-seven, with force and arms, at Edgefield court-house, in the district and State aforesaid, in and upon Mary Freeman, in the peace of God and this State then and there being, feloniously, wilfully, and of his malice aforethought, did make an assault, and that he the said Wiley Freeman, with a certain gun of the

value of ten dollars, then and there being charged with gun powder and a leaden bullet, which gun last aforesaid, he, the said Wiley Freeman, labourer, then and there in both his hands had and held, at, against, and upon her the said Mary Freeman, then and there feloniously, wilfully, and of his malice aforethought, did discharge and shoot off, her the said Mary Freeman, in and upon the left side of the said Mary Freeman, a little below the left breast of the said Mary Freeman, then and there feloniously, wilfully, and of his malice aforethought, did strike and wound, giving to the said Mary Freeman, then and there, with the leaden bullet aforesaid, out of the said last mentioned gun aforesaid, discharge and shoot off, in and upon the said the left side of the said Mary Freeman, one other mortal wound, of the breadth of one inch and of the depth of seven inches, of which the said last mentioned mortal wound, the said Mary Freeman, on and from the said tenth day of April last aforesaid, in the year last aforesaid, until the eleventh day of April last aforesaid, in the year last aforesaid, at Edgefield courthouse aforesaid, did languish, and languishing did live, on which said eleventh day of April, in the year last aforesaid, about the hour of five o'clock in the morning, she the said Mary Freeman, at Edgefield courthouse, in the district and State aforesaid, of the mortal wound aforesaid died; and so the jurors aforesaid, upon their oaths do say, that the said Wiley Freeman, her, the said Mary Freeman, in manner and form last aforesaid, feloniously, wilfully, and of his malice aforethought, did kill and murder, against the peace and dignity of the same State aforesaid."

In this latter ancient and archaic form we find detail upon detail, needless and useless repetition after repetition, conclusions without facts. A ridiculous and laborious written instrument having the significance of a voodoo incantation to awe the accused rather than have the effect of informing him of the crime of which he is charged.

The long form for many years has been the cherished idol of the legalistic mind and the curse and nightmare of every member of the bar who has had the duty as a prosecuting attorney to prepare an indictment or information.

The crime with which the defendant is charged is "murder." "Murder," as defined at common law (29 C.J. 1083) and by our statute (Comp.St.1929, § 35-301), is the unlawful killing of a human being with malice aforethought. The term "murder" is a word of universal and common meaning. No citizen of even less than average intelligence can fail to understand the significance of a charge of murder preferred against him. In its usual acceptation it means the taking of a human life unlawfully.

In New Mexico we have provided a simple means of indictment or information by which, and within the Constitution, an accusation can be presented against one accused of a crime which sufficiently identifies the charge against the accused, so that

his conviction or acquittal may prevent a subsequent charge for the same offense; notify the accused of the nature and character of the crime charged against him to the end that he may prepare his defense; and enable the court upon conviction to pronounce judgment according to the right of the case.

The form we have prescribed does not require the technical craftsmanship of an artist in rhematics for the drawing of an indictment. Validity is not sacrificed to perfection of form, nor is justice delayed or defeated by legalistic insistence upon statement of details which serve no useful purpose. People v. Bogdanoff, 254 N.Y. 16, 171 N.E. 890, 891, 69 A.L.R. 1378. We have provided that every accused shall be informed against as the defendant here insists he shall be informed against, in simple, understandable language of the crime he is charged with. This was done in the instant case.

When the defendant Hyman Roy was arraigned and the information read to him, he fully understood the charge against him, to wit, that he was charged with having murdered Martha Hutchinson. We question whether he would have understood the charge as well had the same been phrased as the old form of indictment quoted from the Wiley Freeman Case, supra.

An information or indictment is sufficient if from its language and form those elements which the Constitution guarantees to an accused are therein found.

We quote with approval from the able majority opinion in the case of People v. Bogdanoff, supra: "For generations attempts have been made, with varying degree of success, to simplify forms of indictment. Such attempts may not be thwarted by insistence upon the preservation of outworn legalistic formulas. 'An indictment, then, within the meaning of the constitution, is nothing more than what it is defined to be by Blackstone' (4 Com. 302), 'a written accusation, of one or more persons, of a crime or misdemeanor, preferred to, and presented by, a grand jury, upon oath.' Wolf v. State, 19 Ohio St. 248. We may not hold that the framers of the Constitution intended that all the formalities of the old common-law indictments must remain forever inviolate. They intended, undoubtedly, that a written accusation of a crime must be presented by the grand jury before an accused may be held for trial upon a charge of felony. From the days of Magna Charta, the law of the land accorded an accused such protection against unfounded charges. The Legislature cannot dispense with a 'written accusation' by the grand jury, but it can prescribe new forms of indictments, and dispense with some of its technical formalities. See Lougee v. State, 11 Ohio, 68; State v. Schnelle, 24 W.Va. 767."

Hyman Roy took the life of Martha Hutchinson. He does not contend otherwise. His attempted defense was insanity. He was tried and convicted of the crime for which he was held. We see no

substantial right guaranteed him by the Constitution which has been denied him.

Defendant in his brief would leave the inference that Judge O'Brien, who wrote the minority opinion in the Bogdanoff Case, denominated the short form of indictment, as chaos and not law. There never has been a more treacherous bed of quicksand than the old form of indictment into which justice could sink out of sight and the guilty freed under technicalities. If the short form be denominated chaos and the old archaic form law, then we prefer to divorce the law and take chaos to spouse.

Another recent case upon the subject under discussion is State v. Engler, 217 Iowa, 138, 251 N.W. 88, decided November 14, 1933.

Another very able, and also very recent, case upon the subject of short forms of indictments and information is the case of State v. Capaci, 179 La. 462, 154 So. 419, 423, decided February 26, 1934. The Legislature of Louisiana adopted a code of criminal procedure, in which it was provided that in order for an indictment to charge the crime of murder it would be sufficient to charge: "A. B. murdered C. D."

The Capaci Case is directly in point with the present case, and we quote with approval from the court's opinion:

"Defendant in this case is apprised by the indictment with all necessary certainty that the crime with which he is charged is murder, and this satisfies the requirement of Amendment 6 to the Federal Constitution, that the accused be informed as to the nature and cause of the accusation: United States v. Mills, 7 Pet. [138] 142, 8 L.Ed. 636; United States v. Cook, 17 Wall. [168] 174, 21 L.Ed. 538; State v. Bartley, 34 La.Ann. [147] 149; State v. Granville, 34 La.Ann. 1088.

"The indictment in the White Case [172 La. 1045, 136 So. 47], above cited, merely charged that the defendant 'murdered' the deceased.

"In the case now before us, the indictment charges that defendants 'wilfully and feloniously murdered' the deceased.

"Since the word 'murdered' used in the indictment in this case is 'sufficient to include in its legal significance the unlawful killing of a human being with malice aforethought,' as held in the White Case, the addition of the words 'wilfully and feloniously' is an unnecessary allegation, and must be rejected as surplusage, under article 240 of the Code of Criminal Procedure. See, also, State v. Leonard, 162 La. 357, 362, 110 So. 557."

If an indictment or information be deemed insufficient, we have provided by rule that the defendant may call for a bill of particulars. This protects the rights of the accused. This bill of particulars must state as much as may be necessary to give the defendant and the court reasonable information as to the nature and character of the crime charged. This bill of particulars becomes a matter of record. The information and bill of particulars can be read together.

"In Massachusetts the Legislature has made similar provision for a bill of particulars which may be demanded by an accused as of right. R.L. c. 218, § 39. There it had been held that now the indictment and bill of particulars must be read together. The bill of particulars thus becomes part of the record. Commonwealth v. Howard, 205 Mass. 128, 91 N.E. 397; Commonwealth v. Peakes, 231 Mass. 449, at page 456, 121 N.E. 420. If in truth the bill of particulars may be read together with the indictment and becomes part of the record, then it would seem that no constitutional rights of the accused have been infringed by the statute now under consideration." People v. Bogdanoff, supra.

The defendant demands, not only that the information be couched in simple, understandable language of the crime he is charged with, but also that he be informed of the acts constituting that crime, and in sufficient detail to enable him to prepare his defense. This he did secure more adequately under the short form of information coupled with a bill of particulars than he possibly could under the old and archaic form. The function of the bill of particulars is to supply additional information concerning an accusation that one accused has done an act or acts constituting a crime.

"In spite of the meticulous search in the remote past by the courts for technical imperfections which might render an indictment insufficient, where the pleader had sufficient skill to follow common-law forms accurately, the indictment might in fact give to an accused little information of the nature or cause of the accusation. 'General terms of law, having a common-law significance seldom particularize the act charged.' People v. Farson, supra [244 N.Y. 413, 155 N.E. 724]. Certain offenses might be charged in such general terms that a bill of particulars was customarily required. See Lambert v. People, 9 Cow. 578, at pages 586 and 587; also Rex. v. Hamilton, 7 Car. & P. 448; Reg. v. Stapylton, 8 Cox. C.C. 69; Rex v. Bootyman, 5 Car. & P. 300; 9 Halsbury Laws of England. If now the indictment and the bill of particulars, which a defendant can demand, may be read together and constitute the written accusation which the grand jury has made and which the accused must meet, the right of an accused to be informed of the nature of the accusation against him receives more adequate protection under the statute than at common law, and an accused has been deprived of no fundamental or substantial rights. Commonwealth v. Jordan, 207 Mass. 259, 93 N.E. 809; Commonwealth v. Farmer, 218 Mass. 507, 106 N.E. 150." People v. Bogdanoff, supra.

The defendant here complains of the deficiency of the bill of particulars. He failed to call for a supplemental bill of particulars. This was a voluntary failure on his part and we cannot hear his complaint.

"It is said that at times a defendant may not choose to request a bill of particulars

to supplement the form of indictment used, and that then the record would not show the specific crime for which the defendant has been indicted. That may be true, but a voluntary failure to assert a right provided by statute constitutes a weak foundation for a claim that the statute deprives the accused of a constitutional right. Patton v. United States [281 U.S. 276], 50 S.Ct. 253, 74 L.Ed. 854 [70 A.L.R. 263]. At all times it was possible that the record might not show that an indictment· charged the particular crime for which a defendant was convicted or indeed any crime, if the defendant chose not to challenge the sufficiency of the indictment. The conviction stood if opportunity to challenge had not been denied. People v. Wiechers, 179 N.Y. 459, 72 N.E. 501, 1 Ann.Cas. 475." People v. Bogdanoff, supra.

By the provisions of article 2, § 14, of our Constitution one accused of a crime has the right "to have the charge and testimony interpreted to him in a language that he understands."

In the case of State v. Cabodi, 18 N.M. 513, 138 P. 262, 263, we said: "Under this provision the defendant is entitled to have the testimony interpreted to him in a language which he understands. The right cannot be taken from a defendant, but it certainly is incumbent upon him, in some appropriate manner, to call to the attention of the trial court the fact that he does not understand the language in which the testimony is given. If such were not the case, it would be possible for a defendant to remain silent throughout the trial, and upon conviction for the first time bring to the knowledge of the court the fact that he did not understand the language in which the testimony was given. In other words, he could remain silent, and take his chance of a favorable verdict, failing in which he could secure a new trial upon the ground that he did not understand the language in which the testimony was given. The statement of the proposition demonstrates its absurdity."

The principle enunciated by this court in the Cabodi Case is applicable here. The defendant in the instant case, having gone to trial without calling for a supplemental bill of particulars, remained silent and cannot now be heard to complain. The claimed insufficiency in the bill of particulars was not pointed out to the trial court to enable that tribunal to pass thereon. Had the trial court found the same insufficient, the state would have been permitted to correct it by a supplemental bill of particulars as provided by section 3 of Rule 35-4409.

The defendant also claims that even taking the bill of particulars in connection with the information, it is impossible to tell the exact nature of the crime charged. He argues that it might have been any one of seven types of murder, as for example by lying in wait, torture, murder while attempting to perpetrate a felony, or both first and second degree murder. Comp.St.1929, § 35-304. The defendant inquires what protection he would have

if he were subsequently arrested for murder in the second degree.

If, as the defendant states, all of the "seven types of first degree murder and the entire gamut of second degree murder" is embraced within the terms of the information, he clearly would be protected against a subsequent trial for any and all of the various types and degrees of murder which he states that the information embraces.

It has long been a practice in this state, even before the adoption of the new rules relating to short forms of indictment and information, to charge in one count first-degree murder, second-degree murder, and voluntary manslaughter. We have held that the charge of first-degree murder includes second-degree murder and voluntary manslaughter. State v. Burrus, 38 N.M. 462, 35 P.(2d) 285; State v. Puckett, 39 N.M. 511, 50 P.(2d) 964. Under the present practice an information in one count charging murder in the first degree includes therein murder in the second degree and voluntary manslaughter.

We come now to the first point raised by the defendant, and which we deem the most important. Its importance is best judged by a consideration of its effect upon the future course of our method of pleading, practice, and procedure in the conduct of our courts and the administration of law. The trial court rules have been in force and effect for about two years. If not legally promulgated, now is the time to say so.

The defendant contends that if our trial court rules are promulgated pursuant to Laws 1933, c. 84, then they are void because chapter 84 is unconstitutional in that it delegates legislative power to the judiciary. The defendant claims that the power to provide rules of pleading, practice, and procedure is one which is peculiarly and intrinsically vested in the legislative department by the Constitution of New Mexico and that the Legislature cannot abdicate this field to the judiciary.

The Attorney General rebuts this proposition upon two theories: First, that the power to provide rules of pleading, practice, and procedure is a power granted by the Constitution of New Mexico exclusively to the courts, and that, when we promulgated the trial court rules, we were performing a function and duty which is inherently ours. Second, that if we hold that such power is not derived from the Constitution then the Legislature was within its constitutional rights in enacting chapter 84, because the Legislature was not exercising an exclusive legislative function when it had been making rules of practice and procedure. Not being an exclusive legislative function, the Legislature could delegate the same to this court without contravening the constitution.

We proceed to dispose of the entire question and proceed under the assumption that the trial court rules were promulgated and adopted by us not necessarily under any delegation of power, but as consequent on the enactment of chapter

84. We hold that this act is not unconstitutional. It does not attempt to delegate exclusively legislative powers to the judiciary.

Article 3, § 1, of our Constitution provides: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted."

We are committed by our Constitution to the doctrine of separation of powers. It is fundamental that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch. The power to make law is reserved exclusively to the Legislature, and any attempt to abdicate it in any particular field, though valid in form, must necessarily be held void.

Chapter 84, however, does not authorize the judiciary to invade the province of a co-ordinate branch of the government. The power to provide rules of pleading, practice, and procedure is not necessarily a legislative function.

The leading case in the United States on the point we are considering is the case of In re Constitutionality of Section 251.18, Wisconsin Statutes, 204 Wis. 501, 236 N. W. 717, 718. The Wisconsin statute (section 251.18, St.1929) construed in that case is practically the same as chapter 84, L. 1933. The New Mexico act was apparently modeled after the Wisconsin statute.

In the Wisconsin case, as here, the principal attack upon the validity of the law was that it constituted a delegation by the legislature of its legislative power. The Wisconsin court said: "It is not only a matter of some difficulty to set precisely the border lines of legislative, executive, and judicial powers, but it also seems quite clear that, either by custom or constitutional mandate, or the inherent necessities of the situation, the three branches of government have heretofore exercised other powers than those which, under the doctrine of separation of powers, belong peculiarly and exclusively to them. In State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 496, 220 N.W. 929, 938, the court said: 'What it seems to us is demonstrated by the discussion in the Hampton Case (276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624), * * * is that there never was and never can be such a thing in the practical administration of the law as a complete, absolute, scientific separation of the so-called co-ordinate governmental powers. As a matter of fact, they are and always have been overlapping. Courts make rules of procedure which in many instances at least might be prescribed by the Legislature. When courts through a receiver reach out and administer a great railway system extending from one ocean to the other, they are not exercising a strictly judicial power; they are exercis-

ing an administrative or executive power, which historically has found its way into the judicial department. The Constitution reserves to the Legislature the power to act as a court in certain cases. When it acts as such, it exercises a judicial power. Every executive officer in the execution of the law must of necessity interpret it in order to find out what it is he is required to do. While his interpretation is not final, yet in the vast majority of cases it is the only interpretation placed upon it, and, as long as it is acquiesced in, it becomes the official interpretation which the courts heed and in which they often-times acquiesce as a practical construction.' "

The authorities clearly establish that the power to regulate procedure is considered a judicial power, or at least that it is not considered to be a purely or distinctively legislative power.

In Wayman v. Southard, 10 Wheat. 1, 43, 6 L.Ed. 253, the Supreme Court of the United States, speaking through Chief Justice Marshall, said: "The courts, for example, may make rules, directing the re-turning of writs and processes, the filing of declarations and other pleadings, and other things of the same description. It will not be contended, that these things might not be done by the legislature, with-out the intervention of the courts; yet it is not alleged, that the power may not be conferred on the judicial department." ·

Another able and well-reasoned opinion on this subject is found in the case of State ex rel. Foster-Wyman Lumber Co. v. Superior Court for King County, 148 Wash. 1, 267 P. 770, 771, handed down by the Supreme Court of Washington on May 29, 1928, where it was held that, assuming the right of the Legislature to make rules for the court, it does not follow that such action is a legislative function. The court said: "Not all acts performed by a Legis-lature are strictly legislative in character. A failure to recognize this distinction often gives rise to the belief that one of our lawmaking bodies has abdicated its duty, and attempted to transfer its legislative mantle to the shoulders of another body, not legislative, thereby subverting the pur-pose of its creation and denying the people of the commonwealth the right to have the laws which govern them enacted by their duly chosen representatives."

When the legislature enacted chapter 84, it merely withdrew from a field wherein it had theretofore functioned as a co-or-dinate branch of our government with the court in the promulgation of rules of pleading, practice, and procedure. Wheth-er the legislative branch of the govern-ment was ever rightfully in the rule-mak-ing field, or was a mere trespasser or usurper, need not now be determined. Chapter 84 is not a delegation of power. It is a mere abdication or withdrawal from the rule-making field. It is in effect a relinquishment of the rule-making field to the court. The Legislature, in effect, said to the court: "You make the rules here-after."

The power of the Supreme Court to provide rules of pleading, practice, and procedure is not novel in this state. The Territorial Legislature recognized in the Supreme Court the power to make rules for itself and the district courts. As evidence of this we find the following territorial statutes: Act of Feb. 2, 1859, C. L.1865, c. 15, § 7, p. 102, C.L.1897, § 874. See C.L.1897, § 875. Also chapter 8, Act of Feb. 13, 1880, C.L.1897, § 2877. See, also, section 2685, C.L.1897, subsec. 177, c. 73, Act of March 18, 1897, section 4258, N.M.Code Ann.1915; Comp.St. 1929, § 105-1005. We find the published rules promulgated by the Territorial Supreme Court in 14 N.M. 701–718. These rules had the force and effect of law. Rio Grande Irrig. & Colonization Co. v. Gildersleeve, 174 U.S. 603, 608, 19 S.Ct. 761, 43 L.Ed. 1103, Territory v. Gonzales, 11 N.M. 301, 68 P. 925. It is sufficient here to hold that when the Legislature enacted chapter 84, it did not delegate to the court a function exclusively legislative contrary to section 1, art. 3, of our Constitution.

We therefore hold that the trial court rules promulgated by us, though promulgated subsequent to and consequent upon the enactment of chapter 84, were promulgated, nevertheless, by this court in the exercise of an inherent power lodged in us to prescribe such rules of practice, pleading, and procedure as will facilitate the administration of justice. 7 R.C.L. 1023 and cases cited.

The Attorney General contends for the exclusive right of this court to promulgate rules of pleading, practice, and procedure, and that such exclusive right is one over which the legislature has no control. We deem it unnecessary at this time to decide this academic proposition. There is no conflict at the present time between any rule promulgated by this court with any law enacted by the Legislature. If such a question ever arises, then will be the proper time to decide which is paramount in the rule-making field, the court or the Legislature. A constitutional question, and one so controversial, should not be determined in advance of necessity.

■ Another question raised at this time, and which we are called upon to determine, is the power of this court to provide rules of pleading, practice, and procedure for the trial courts or district courts, inasmuch as such courts are constitutional courts and can make their own rules.

"Superintending control" was not unfamiliar to the framers of our Constitution.

Article 6, § 2, of the Constitution of New Mexico provides: "The appellate jurisdiction of the supreme court shall be co-extensive with the state, and shall extend to all final judgments and decisions of the district courts, and said court shall have such appellate jurisdiction of interlocutory orders and decisions of the district courts as may be conferred by law."

Article 6, § 3, in part, provides: "The supreme court shall have original jurisdiction in quo warranto and mandamus against

all state officers, boards and commissions, and shall have a superintending control over all inferior courts; it shall also have power to issue writs of mandamus, error, prohibition, habeas corpus, certiorari, injunction and all other writs necessary or proper for the complete exercise of its jurisdiction and to hear and determine the same."

Here we find three separate and distinct grants of jurisdiction: (1) The appellate jurisdiction; (2) the superintending control over inferior courts; and (3) the original jurisdiction to be exercised by certain writs.

The power of superintending control is the power to control the course of ordinary litigation in inferior courts, as exercised at common law by the Court of King's Bench and by the use of writs specifically mentioned in the Constitution and other writs there referred to or authorized. See In re Constitutionality of Sec. 251.18, Wis.Statutes, supra.

The superintending control over inferior courts does not limit this court to the promulgation of rules of court which have for their purpose the regulation of matters of relatively minor importance, which merely govern the everyday routine of courts and enable them to act as such. These should rightly be left to the district courts themselves. For example, the trial judge in each district is better able to determine what routine rules will expedite the business of his particular court. We are concerned with the more important

rules of adjective law governing the trial of lawsuits and furnishing the machinery by which litigants may secure effective enforcement of their substantive rights. The powers essential to the functioning of courts, in the absence of the clearest language to the contrary in the constitution, are to be taken as committed solely to us to avoid a confusion in the methods of procedure and to provide uniform rules of pleading and practice.

This question was treated in the case of State ex rel. Foster-Wyman Lumber Co. et al. v. Superior Court for King County et al., supra, cited with approval in the case of In re Constitutionality of Section 251.18, Wis.Statutes, supra.

In the Wisconsin case the court there relies upon the following comment by Dean Pound:

"As to trial courts, the historical argument already made is decisive of the power of the reviewing court of general jurisdiction to govern procedure by general rules, if not precluded by legislation. As the English judicial organization stood at the time our Constitutions were adopted, trials were not had in the courts of Westminster, as a rule. Trials at bar in the superior courts were rare. Causes were heard at circuit before the King's justices or commissioners of assize and nisi prius, so that a justice of the King's Bench might try at circuit under a commission of assize and nisi prius a cause depending in the common pleas or vice versa. In other words, the trial courts were independ-

ent tribunals, quite as old as the superior courts. But the proceedings at circuit were reviewed on motion for new trial, motions in arrest, motions for judgment and the like in the superior courts, in bank at Westminster. When our Constitutions were adopted, practice for these cases was regulated by general rules of the superior courts at Westminster, some of which had been in force since the seventeenth century.

"It would seem, therefore, that the supreme court of one of our states, which has always been looked upon as the historical equivalent of the court of King's Bench, might constitutionally be given power to regulate the practice in the causes it has the power to review in bank, as was the doctrine at common law as between the court at Westminster and the circuits.

"It should be noted that the statute of Colorado, enacted at the instance of the Bar Association of that state, proceeds upon this theory.

"Moreover, this power of the highest court of general jurisdiction of the state, representing the King's Bench in the common-law judicial organization, to make general rules of practice which should govern also in the practice of inferior independent tribunals whose proceedings it had the power to review, was recognized in American legislation until the later tendency to govern every detail of procedure by statute caused the power for a time to be forgotten."

There is an exhaustive annotation in 51 L.R.A. 111, relating to the power of "superintending control" and "supervisory control" as phrased in many Constitutions which is very interesting. A review of all the cases therein enumerated clearly leads us to but one conclusion. It is this: That the power to provide rules of pleading, practice, and procedure for the conduct of litigation in the district courts, as well as rules of appellate procedure, is lodged in this court by the Constitution of New Mexico. That the constitutional grant of power to issue the writs by means of which the power of superintending control is exercised comprehends and carries with it the authority to exercise the power of superintending control to the extent that it can be exerted by those writs and other processes essential to its complete exercise.

As stated in the note to People ex rel. Green v. Court of Appeals of Colorado, 51. L.R.A. 111: "The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur it will be found able to cope with them. And, if required, the tribunals having authority to exercise it will, by virtue of it possess the power to invent, frame, and

formulate new and additional means, writs, and processes whereby it may be exerted."

Being satisfied as we are that chapter 84 is not a grant of power, there is nothing violative of fundamental law or the Constitution in this, the highest judicial body in the state, to prescribe rules for an inferior judicial body.

It is at once manifest that such a power should be placed, and was placed, with the reviewing court, since we are always charged with the duty of determining whether the rulings of the trial court have been such as to operate to the disadvantage of the litigants. State ex rel. Ross v. Call, 39 Fla. 504, 22 So. 748. This need has been recognized from the earliest times. It has been the source of much historical investigation, and the results thereof have been sufficiently stated by that able lawyer and scholar, Dean Roscoe Pound, who has summed the matter up in an article in 10 Ill.Law Rev. p. 172, which we have heretofore quoted from in Re Constitutionality of section 251.18, Wis. Statutes, supra.

In conclusion, we find that the trial court did not err in any manner in the trial of the case below as assigned by the defendant, and that the judgment and sentence of the trial court must stand affirmed, and it is so ordered.

SADLER, C. J., and BICKLEY and BRICE, JJ., concur.

HUDSPETH, Justice.
I concur in the result.