895 So.2d 225 (2004)
Andrea K. SCHOENVOGEL, a minor, who sues by and through her mother and next friend, Ava SCHOENVOGEL; and Ava Schoenvogel, individually
v.
VENATOR GROUP RETAIL, INC., d/b/a Lady Footlocker; and the estate of Anthony DaSilva, deceased.
1021932.
Supreme Court of Alabama.
July 9, 2004.
*227 John W. Haley and Bruce J. McKee of Hare, Wynn, Newell & Newton, LLP, Birmingham; and Richard S. Jaffe and Stephen A. Strickland of Jaffe, Strickland & Drennan, P.C., Birmingham, for plaintiffs.
John J. Coleman, C. Paul Cavender, and Ashley H. Hattaway of Burr & Forman, LLP, Birmingham, for Venator Group Retail, Inc., d/b/a Lady Footlocker.
Peyton Lacy, Jr., Brian R. Bostick, and Christopher A. Mixon of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Birmingham, for the estate of Anthony DaSilva.
HARWOOD, Justice.
Pursuant to Rule 18, Ala. R.App. P., we accepted the following certified question from the United States District Court for the Northern District of Alabama:
"A. Relevant Facts

"Plaintiff, Andrea Schoenvogel, was employed by defendant Venator Group Retail, Inc., d/b/a Lady Foot Locker at the Lady Foot Locker Store at the Riverchase Galleria in Birmingham, Alabama. She alleges that on August 2, 2000, she was raped by defendant Anthony DaSilva, her supervisor at the time. There were no witnesses to the alleged incident other than plaintiff and DaSilva. Plaintiff was examined at a hospital later on August 2, 2000, but there was no physical evidence of sexual assault. Anthony DaSilva's decomposed body was found hanging from a tree on August 14, 2000. DaSilva previously had been convicted in New York on charges of attempted rape in the first degree and criminal possession of a controlled substance.
"Andrea Schoenvogel 1 and her mother, Ava Schoenvogel, filed this action on June 27, 2001, in the Circuit Court of Jefferson County, Alabama. The named defendants are Venator Group Retail, Inc., d/b/a Lady Foot Locker and the Estate of Anthony DaSilva. The case was removed to federal court on July 27, 2001, on the basis of diversity jurisdiction. Andrea Schoenvogel alleges causes of action for negligent or wanton hiring, supervision, retention and entrustment; assault and battery; invasion of privacy; outrage; violation of the Employer's Liability Act, § 25-6-1, Alabama Code; and felonious injury in violation of § 6-5-370, Alabama Code. Andrea Schoenvogel's mother, Ava Schoenvogel, alleges a cause of action for loss of services.
"Defendants have filed a motion for summary judgment in this action. One of their arguments is that the Dead Man's Statute, § 12-21-163, Alabama Code, prohibits plaintiff from testifying about the alleged rape at trial or using her testimony about the alleged rape to defeat defendants' motion for summary judgment. Plaintiff contends that Rule 601, Ala. R. Evid., applies and allows her testimony about the incident.
"The Dead Man's Statute, § 12-21-163, Alabama Code, provides:

*228 "`In civil actions and proceedings, there must be no exclusion of any witness because he is a party or interested in the issue tried, except that no person having a pecuniary interest in the result of the action or proceeding shall be allowed to testify against the party to whom his interest is opposed as to any transaction with, or statement by, the deceased person whose estate is interested in the result of the action or proceeding or when such deceased person, at the time of such transaction or statement, acted in any representative or fiduciary relation whatsoever to the party against whom such testimony is sought to be introduced, unless called to testify thereto by the party to whom such interest is opposed or unless the testimony of such deceased person in relation to such transaction or statement is introduced in evidence by the party whose interest is opposed to that of the witness or has been taken and is on file in the case. No person who is an incompetent witness under this section shall make himself competent by transferring his interest to another.'
"Rule 601, Ala.R.Evid., effective January 1, 1996, states that, `Every person is competent to be a witness except as otherwise provided in these rules.' In the Advisory Committee's Notes to Rule 601, it is stated:
"`This rule supersedes any inconsistent statutory grounds of incompetency. Chief among these is Alabama's Dead Man's Statute. Ala.Code 1975, § 12-21-163. Superseding the Dead Man's Statute means that survivors will be allowed to testify, if their testimony otherwise complies with the rules of evidence, and that the unavailability of the deceased person will be merely a factor for the jury to consider in determining the weight to give the survivor's testimony. See Beddingfield v. Central Bank of Alabama, N.A., 440 So.2d 1051, 1052 (Ala.1983)(recognizing the significant body of scholarly criticism of the Dead Man's Statute). In superseding the Dead Man's Statute, Alabama follows the lead of such states as Alaska, Arkansas, Delaware, Hawaii, Iowa, Maine, Michigan, Mississippi, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, and Utah. See J. Weinstein & M. Berger, Weinstein's Evidence ¶ 601[03] (1990). See also 2 J. Wigmore, Wigmore on Evidence § 578 (Chadbourn rev.1979)(recognizing that the Dead Man's Statute is a survival from an earlier and much broader incompetency statute and characterizing its survival as `deplorable'); M. Ladd, Uniform Rules of Evidence  Witnesses, 523, 526 (1956) (characterizing the elimination of the Dead Man's Statute as one of the first steps in improving the law of evidence).'
"Despite the statement in the Advisory Committee Notes that the Dead Man's Statute has been superseded by the evidentiary rule, there is indication that the Dead Man's Statute is still viable. See Smart v. Sandy Spring National Bank of Maryland, [(No. Cw.99-0336-AH-C, February 23, 2000)] (S.D.Ala.2000) [not published in F.Supp.2d]; Evans v. Waddell, 689 So.2d 23, 30 (Ala.1997). It is essential to the outcome of this action to determine the applicability of the Dead Man's Statute to plaintiff's testimony about the alleged rape.
"B. Question of Law to Be Answered

"(1) Has the Alabama Dead Man's Statute, § 12-21-163, Alabama Code, been superseded by Rule 601, Ala. R. Evid.?

*229 "1 Andrea Schoenvogel originally filed this action by and through her mother and next friend, Ava Schoenvogel. Subsequent to the filing of this action, Andrea Schoenvogel reached the age of majority."

I. This Court's Intention in Adopting Rule 601

The plaintiffs, Andrea K. Schoenvogel, a minor, who sues by and through her mother and next friend, Ava Schoenvogel; and Ava Schoenvogel, individually, and one of the defendants, the estate of Anthony DaSilva ("DaSilva's estate"), agree that this Court intended that Rule 601, Ala. R. Evid., supersede the Dead Man's Statute, § 12-21-163, Ala.Code 1975. (Schoenvogels' brief, pp. 24-28; Brief of DaSilva's estate, p. 24.) The other defendant, Venator Group Retail, Inc., d/b/a Lady Footlocker ("Venator"), does not necessarily agree, but essentially deflects the question by arguing that "[w]hether or not Rule 601 ever affected the Dead Man's Statute is really only an extraneous issue," because of Venator's perception that the Legislature has "repeatedly re-enacted the Statute subsequent to the adoption of Rule 601." (Venator's brief, p. 28.)
In 1988 this Court appointed a committee to consider the formal adoption of a body of evidence law. Professor Charles W. Gamble was appointed the reporter of the committee. In his article, "Drafting, Adopting and Interpreting the New Alabama Rules of Evidence: A Reporter's Perspective," 47 Ala. L.Rev. 1 (1995), he recounted the following history:
"The twenty-three member Committee on the Alabama Rules of Evidence held its first meeting on September 9, 1988. The work product of this group, after five years of drafting and debate under the administrative sponsorship of the Alabama Law Institute, was submitted to the Alabama Supreme Court on April 12, 1993. The Court then ordered that the proposed Alabama Rules of Evidence be circulated for discussion by being published in the advance sheets to the Southern Reporter. This order likewise invited the submission of written objections and scheduled oral arguments concerning the rules. Oral arguments were held before the Supreme Court of Alabama on October 7, 1993....
"Following these arguments, the Alabama Supreme Court took the proposed rules under advisement. Subsequently, a revised version of the Alabama Rules of Evidence, reflecting changes made in response to some of the written and oral arguments, was circulated for comment in the advance sheets to the Southern Reporter. The objections to the first version of the proposed Alabama Rules of Evidence resulted in the revision of several rules to reflect preexisting Alabama common law.... The second order, which resulted in the publication of the second version of the proposed rules, provided that comments would be allowed until December 30, 1994. A final hearing on the proposed rules was held on February 14, 1995. The supreme court then directed the Reporter of Decisions to prepare, in consultation with the Reporter to the Alabama Rules of Evidence Committee, a final draft. On July 19, 1995, the Alabama Supreme Court issued an order adopting the Alabama Rules of Evidence with an effective date of January 1, 1996. This order was accompanied by a final version of the rules."
47 Ala. L.Rev. at 3-4 (footnotes omitted). Professor Gamble further noted:
"Because of the historic and concurrent power exercised by the judicial and legislative branches over the law of evidence, *230 however, the Advisory Committee was very careful to keep to a minimum the instances when the effect of any particular rule would abrogate a preexisting statute. A few such instances were nevertheless inevitable. The Dead Man's Statute, for example, is abrogated by adoption of the liberal competency standard found in Rule 601."
47 Ala. L.Rev. at 7 (footnotes omitted).
Only one objection to the proposed abrogation of the Dead Man's Statute was received by the committee or the Court. That objection and all other objections received were summarized for the Court by Professor Gamble in the report he submitted to it, as set out in the appendix to his article. Important to the present discussion is the fact that, after stating clearly in his report that the adoption of Rule 601 would abrogate the Dead Man's Statute, referencing the Advisory Committee's Notes, Professor Gamble offered this suggestion:
"If the Alabama Supreme Court chooses not to abrogate the Dead Man's Statute then that result can be accomplished by merely amending Rule 601 to read:
"`Every person is competent to be a witness except as otherwise provided in these rules and the dead man's statute.'
"A less drastic alternative would be to provide in Rule 601 for the survival of the Dead Man's Statute but only as it precludes the survivor from relating a statement of the deceased. This would significantly limit the breadth of the statute's exclusionary impact."
Gamble, 47 Ala. L.Rev., appendix at 44.
Although this Court elected to make certain changes to the proposed rules in response to the various comments and objections received, it chose to adopt Rule 601 unchanged and without any repudiation of the Advisory Committee's Notes.
Against this backdrop of lengthy and painstaking vetting of the rules by this Court, it cannot be gainsaid that this Court intended for the adoption of Rule 601 to abrogate the Dead Man's Statute.

II. This Court's Rulemaking Power Under the "New" Judicial Article

"On December 18, 1973, the people of this state overwhelmingly approved a fundamental reorganization of the state's judicial system. By a vote of almost two-to-one, the people approved a constitutional amendment (new judicial article) which was proclaimed on December 27, 1973 as Amendment No. 328 to the Alabama Constitution, 1901, and which laid to rest a system that served well in the 18th and 19th centuries, but which was strained by the economic, political and social conditions of the 20th century. On the old foundations, a modern judicial system has been erected, designed to meet the needs of the people of this state in the last quarter of this century, and to continue to be responsive to the kaleidoscopic challenges of modern-day life on into the 21st century.
"The citizens of this state now demand a modern, responsive, effective judicial system which does not cling to the ideas and concepts of a more pristine period when problems of judicial administration were slight. For in today's complex society, just as procedure is the handmaid of justice, so too, judicial administration is the handmaid of an effective judicial system. The independence of the judiciary to do those things judicial cannot realistically be separated from the need for administrative independence if the mandate of the people for a more effective system of justice is to be fulfilled.

*231 "One can not escape some of the underlying themes of the new constitutional framework for courts when a comparison is made between the provisions of the old judicial article and the new judicial article. One of the underlying themes is a constitutional mandate that the judicial branch exercise more administrative independence.
"Another underlying theme is that the Supreme Court should make the initial determination of the operating rules for the judicial system, subject only to specific restraints, in order to ensure a more effective businesslike operation of the entire court system. While many legal and judicial scholars in Alabama felt that `rule-making power' previously existed in the inherent powers of the equal but separate judicial branch of government, the highest court in this state had evidenced considerable restraint in the past pertaining to the exercise of such powers. In order that the judiciary, as well as the other branches of government, understand that `rule-making power' was clearly vested within the Supreme Court, the judicial article mandated that the highest court of Alabama make and promulgate the rules of administration for all courts, as well as the rules governing practice and procedure. Regardless of whether this is construed as a constitutional transfer of authority or a clearer restatement of inherent powers, there can be no doubt that the new judicial article places the mandatory function on the Supreme Court to make the operating rules for the judicial system, subject to only specific restraints and checks. See Section 6.11 of Amendment 328."
Morgan County Comm'n v. Powell, 292 Ala. 300, 325-26, 293 So.2d 830, 853-54 (1974) (Heflin, C.J., dissenting).
Section 6.11 of Amendment No. 328 to the Alabama Constitution of 1901 reads:
"The supreme court shall make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts; provided, however, that such rules shall not abridge, enlarge or modify the substantive right of any party nor affect the jurisdiction of circuit and district courts or venue of actions therein; and provided, further, that the right of trial by jury as at common law and declared by section 11 of the Constitution of Alabama 1901 shall be preserved to the parties inviolate. These rules may be changed by a general act of statewide application."
Section 6.21(h) of Amendment No. 328 provides:
"Except to the extent inconsistent with the provisions of this article, all provisions of law and rules of court in force on the effective date of this article shall continue in effect until superseded in the manner authorized by the Constitution."
The "old judicial article" comprised Art. VI, §§ 139-172, Constitution of Alabama 1901. The "new judicial article" repealed the old judicial article and replaced it with an entirely new Article VI. There was no counterpart to § 6.11 in the old judicial article, but rather Art. VI, § 140, was deemed to imply an inherent power in the Supreme Court of Alabama to make rules governing practice and procedure in the courts. Section 140 provided that "the supreme court shall have the power to issue writs of injunction, habeas corpus, quo warranto, and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions." Article VI, § 139, of the old judicial article, like Art. VI, § 6.01, of the new judicial article, vested the judicial power of the State in the Supreme *232 Court and other specified courts (except, under § 139, the judicial power of the Senate sitting as a court of impeachment, and under § 6.01, "[e]xcept as otherwise provided by this Constitution").
Analyzing the rulemaking powers established by those constitutional provisions, this Court declared as follows in Ex parte Foshee, 246 Ala. 604, 606-07, 21 So.2d 827, 828-29 (1945):
"It has been the recognized doctrine in this State that a legislative enactment takes precedence over a rule of the Court. Nichols v. Dill, 222 Ala. 455, 132 So. 900 [(1931)]; Williams v. Knight, 233 Ala. [42], 169 So. 871 [(1936)]; Porter v. State, 234 Ala. 11, 174 So. 311 [(1937)]; 21 Corpus Juris Secundum, Courts, § 176, p. 276 et seq.; 14 Amer. Jur. 347; 21 Corpus Juris Secundum, Courts, § 179, subsec. b, p. 288.
"But there have been efforts to hamper the orderly functioning of this Court, which have been repudiated. Hackett v. Cash, 196 Ala. 403, 72 So. 52 [(1916)]; Halle v. Brooks, 209 Ala. 486, 96 So. 341 [(1923)]; Thornhill v. Gulf Coast Produce Exch., 219 Ala. 251, 121 So. 912 [(1929)]; Buttrey v. Buttrey, 218 Ala. 268, 118 So. 282 [(1928)].
"To make a rule for an inferior court this Court must have authority conferred either by the Constitution or by statute. 21 Corpus Juris Secundum, Courts, § 170, p. 264; State v. Roy, 40 N.M. 397, 60 P.2d 646, 110 A.L.R. 1 [(1936)].
"Our Constitution, section 140, gives this Court superintendence and control of inferior jurisdictions, and that includes by implication the power to make rules, and it is therefore sometimes said to be an inherent power. 21 Corpus Juris Secundum, Courts, § 170, p. 264; State v. Roy, 40 N.M. 397, 60 P.2d 646, 110 A.L.R. 1 [(1936)].
"But the Constitution confers on the legislature plenary power to legislate except as restricted by the Constitution, State or federal. Section 44, Const.; Sisk v. Cargile, 138 Ala. 164, 172, 35 So. 114 [(1903)]. This includes the power to prescribe rules of practice and procedure in the courts of the State. Porter v. State, 234 Ala. 11, 174 So. 311 [(1937)]. See, Sibbach v. Wilson & Co., 312 U.S. 1, 655, 61 S.Ct. 422, 85 L.Ed. 479 [(1941)]; Wayman v. Southard, [23 U.S.] 10 Wheat. 1, 42, 6 L.Ed. 253 [(1825)]. The power of this Court flowing from the provisions of section 140 of the Constitution by inference and the power conferred on the legislature to prescribe rules of practice and procedure must be coordinated.
"The power which this Court has to make rules and regulations for inferior courts is to do a judicial act. The legislative power to make the rules and regulations for all the courts is legislative. There are certain proceedings which are so vital to the efficient functioning of a court as to be beyond the legislative power. This Court may by section 140, supra, make rules and regulations which cover that field and also those which extend beyond it. The legislature has the same power in the latter field. But that of the legislature in it being by express constitutional grant is superior to that of this Court inferred merely from section 140, supra. The legislature may preempt that field or omit to act in it, so as to permit the court to have full sway temporarily in it. Or it may by legislative enactment give clear expression to the constitutional implication in the form of a delegation to this Court of the power to make rules of practice for inferior tribunals. In either event, the action by this Court is judicial in nature, *233 but becomes the law pro tanto and remains so until it is amended or repealed.
"But the failure of the legislature to act or its express authority to do so given to this Court is operative only until the legislature undertakes again to enter the field by making rules and regulations through legislative channels. It cannot permanently diminish or abrogate its constitutional power to be thereafter exercised to make laws, including those pertaining to practice and procedure. It cannot curtail future constitutionally authorized legislation.
"Since the legislature can make rules of practice and procedure, it can amend any rules made by it, or by this Court, for an inferior court, unless by doing so it prohibits the due and orderly processes by which that court functions, or prevents it from properly functioning. 21 Corpus Juris Secundum, Courts, p. 288, § 179, subsec. b. The legislature may therefore amend the law as expressed in Equity Rule 56, unless by so doing it would hamper the proper functioning of the trial court. Our judgment is that the Act of May 21, 1943, supra, would not have that effect.
"In amending that law, it is immaterial that it purports to amend a rule of this Court. The substance and effect is that it amends the law as thus expressed and refers to the rule for clarity. This is not objectionable, when as enacted it is complete, clear and precise within itself. Harris v. State ex rel. Williams, 228 Ala. 100, 151 So. 858 [(1933)]."
This Court affirmed on a number of subsequent occasions its inherent authority to promulgate rules of practice and procedure for the lower courts over which the Alabama Constitution gave it "superintendence and control." Pankey v. City of Mobile, 250 Ala. 566, 35 So.2d 497 (1948); Louisville & Nashville R.R. v. Johns, 267 Ala. 261, 101 So.2d 265 (1958); Ex parte Huguley Water Sys., 282 Ala. 633, 213 So.2d 799 (1968); and Morgan County Comm'n v. Powell, supra.
Because § 6.11 explicitly confers on this Court rulemaking authority, and, in fact, mandates that this Court exercise that authority, some of the rationale of Ex parte Foshee, supra, is undercut. The Court in Foshee placed great emphasis on the fact that its rulemaking power was derived only "by implication" from the Constitution as it then stood, "flowing from [it] by inference," 246 Ala. at 606, 21 So.2d at 829, as contrasted with the "plenary power" conferred on the Legislature. Thus, in assessing the relative rulemaking powers of the Legislature and this Court under the language of § 6.11, it must be remembered that "[p]re-1973 cases dealing with the Legislature's authority merely provide historical background." Ex parte Stewart, 730 So.2d 1246, 1250 n. 1 (Ala.1999).
Nonetheless, it has long been recognized that the Legislature, operating within its separate sphere of constitutional authority, also has the power to establish rules governing practice and procedure in the courts in this State.
"`We do not, by this opinion, intend in any way to limit the inherent right of courts of general jurisdiction to make such rules as are necessary in the dispatch of business in said courts, but it is within the power of the Legislature, subject to such provisions as may be incorporated in the Constitution, to establish rules of procedure by which courts shall exercise jurisdiction and conduct the trial of cases, and where a positive rule of practice is established by statute, the courts have no discretion in the matter. 15 Juris Corpus 901(275).'"
Porter v. State, 234 Ala. 11, 13, 174 So. 311, 312 (1937).

*234 "We have never denied the right and power of the legislature to enact laws regulating any proceedings in this Court, even though they relate to matters in which the court is exercising its inherent power, so long as such legislation does not impair unduly an exercise of such powers."
Ex parte Dozier, 262 Ala. 197, 199, 77 So.2d 903, 905 (1953).
"`While we recognize in general the right and power of the legislature to prescribe rules of pleading and practice and of evidence, we have also referred to the fact that the court is of constitutional origin, the same as the legislature, and has powers of common law descent which are implied by the terms used in the Constitution. This means that the judicial power is coordinate with the legislature, and neither can encroach upon the other. We have applied that principle to hold that the legislature cannot validly pass a law which will impede the functioning of the court. Ex parte Foshee, 246 Ala. 604, 606(1) [(1945)], 21 So.2d 827; Southern Ry. Co. v. Hanby, 166 Ala. 641, 52 So. 334 [(1910)] [overruled in part on other grounds, Louisville & Nashville R.R. v. Abernathy, 197 Ala. 512, 73 So. 103 (1916)]. So that if the legislature enacts a law which is repugnant to the ordinary power and proper functioning of the court, we very reluctantly point that out in declining to abide by it.'"
Louisville & Nashville R.R. v. Johns, 267 Ala. at 276-77, 101 So.2d at 279-80 (quoting from an opinion on original deliverance in Birmingham Transit Co. v. Persons, 266 Ala. 406, 96 So.2d 673 (1957), that was withdrawn on application for rehearing).
The Legislature exceeds its power in the area of rulemaking if its action "prohibits the due and orderly processes by which [a] court functions, or prevents it from properly functioning," Ex parte Foshee, 246 Ala. at 607, 21 So.2d at 829, or disturbs the functions and orderly processes of the court, Broadway v. State, 257 Ala. 414, 418, 60 So.2d 701, 704 (1952). "[T]he functions and orderly processes of courts which derive their existence from the state constitution may not be disturbed by any legislative enactment." Ex parte Huguley Water Sys., 282 Ala. at 639, 213 So.2d at 805. A legislative enactment may not encroach on the core judicial power. Ex parte Jenkins, 723 So.2d 649, 653-56 (Ala.1998). The mandate to this Court in § 6.11 to make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts is an empowerment by and from the people; it does not depend on legislative enactment for its existence or implementation.
Nonetheless, because that was not true for all features of the new judicial article, and because coordinated confirmatory legislation was helpful for the purpose of furthering the declaration of § 6.01 of the new judicial article that "the judicial power of the state shall be vested exclusively in a unified judicial system," the Legislature enacted Act No. 1205 in 1975, the title of which states that it is an act "[t]o implement the new Judicial Article of the Alabama Constitution (Amendment No. 328, approved December 18, 1973); by establishing a unified judicial system for the state ..." ("the Judicial Article Implementation Act"). Among the sections of that act pertinent to the present discussion were the following provisions, as subsequently codified:
"(a) Since the Supreme Court now has the initial primary duty to make and promulgate rules governing practice and procedure in all courts, as well as rules of administration for all courts, all such rules made and promulgated by the Supreme *235 Court shall be filed in the office of the Clerk of the Supreme Court and published in the official report of decisions. The Clerk of the Supreme Court shall certify to the Secretary of State all such rules. The Secretary of State shall cause such rules to be published in the Acts of Alabama and in any code of the laws of Alabama whenever such codes are published or in pocket supplements to codes.
". . . .
"(c) Rules heretofore promulgated by the Supreme Court shall not be considered to have been superseded or modified by this title unless by express reference in this title or by law hereinafter enacted or by irreconcilable conflict with this title."
Ala.Code 1975, § 12-2-19(a) and (c).
In 1977, as a part of its adoption of the "Code of Alabama 1975," the Legislature included § 12-1-1, which reads as follows:
"Any provisions of this title regulating procedure shall apply only if the procedure is not governed by the Alabama Rules of Civil Procedure, the Alabama Rules of Appellate Procedure or any other rule of practice and procedure as may be adopted by the Supreme Court of Alabama."
That Code section, along with the rest of the Code of Alabama 1975, became effective on October 31, 1977. Ex parte Stewart, 730 So.2d at 1249. As explained in Ex parte Stewart, however:
"[Section] 12-1-1 is also phrased so as to allow a prospective field of operation in that it refers not only to rules existing when the 1975 Code was adopted, but also to `any other rule of practice and procedure as may be adopted by the Supreme Court of Alabama.' Prospective application of § 12-1-1, to the extent that it would never allow a statute enacted after that section's effective date to override a rule of court, would forfeit the authority conferred by the people on the Legislature in § 6.11. Such an application would, therefore, unconstitutionally defeat the mandate of § 6.11 that the Legislature, and not the Court, has the last word on matters of procedure so long as the change is wrought by a general act of statewide application."
(Emphasis added.)
Thus, pursuant to the express legislative declaration in § 12-1-1, when this Court adopted the Alabama Rules of Evidence effective January 1, 1996, those rules supplanted and superseded any provisions of Title 12 of the Code of Alabama 1975 inconsistent with those rules, subject, however, to the limitation declared in Ex parte Stewart that the prospective application of § 12-1-1 would not preclude the Legislature from subsequently overriding one of those rules under the authority conferred on it in § 6.11 to do so by a general act of statewide application.
Therefore, the only questions remaining are whether this Court, in undertaking to abrogate the Dead Man's Statute by adopting Rule 601 of the Alabama Rules of Evidence, exceeded its authority under the Alabama Constitution and whether, assuming this Court did not exceed its authority in adopting Rule 601, the Legislature subsequently changed that rule and revived the Dead Man's Statute by a general act of statewide application.

III. Constitutional Prohibition of Suspension of Laws

Venator argues that Art. I, § 21, Ala. Const. 1901, providing "[t]hat no power of suspending laws shall be exercised except by the legislature," prevents Rule 601 from "suspending" the Dead Man's Statute. Technically speaking, there is a material difference between the repeal or abrogation *236 of a statute and its suspension. "A repeal puts an end to the law; a suspension holds it in abeyance." 82 C.J.S. Statutes § 276 (1999)(footnote omitted).
This Court recognized in Ex parte Ward, 540 So.2d 1350 (Ala.1988), that it had violated § 21 when it "attempted to suspend the operation," 540 So.2d at 1352, of Article 5 of the Judicial Article Implementation Act, which established "a new body of substantive law" pertaining to juvenile proceedings until the Court was about to promulgate complementary rules. At issue in Ward was the effect of that attempted suspension as it related to the subject-matter jurisdiction of juvenile courts based on the age of the accused. The opinion in Ward explains that "the substantive provisions" of the legislation "became effective on October 10, 1975, the date it was approved," 540 So.2d at 1352, but this Court attempted, by resolution, to suspend and defer that effective date until January 16, 1977, to allow time for the promulgation of necessary procedural rules. In Ward, we belatedly recognized that the resolution, given its attempted suspension of substantive law, particular subject-matter jurisdiction, contravened both § 21 and § 6.11 of Amendment No. 328.
We did not hold in Ward, contrary to the extension of its rationale urged by Venator, that § 21 would bar the abrogation by a court rule adopted pursuant to the authority granted in § 6.11 of a prior statutorily effected rule of practice and procedure. To the contrary, it is clear that § 6.11 envisions that this Court's power to promulgate rules of practice and procedure for all courts could supersede legislatively enacted rules of practice and procedure, so long as the rules promulgated by this Court did not abridge, enlarge, or modify the substantive rights of any party, and subject to the right of the Legislature to change the court-adopted rules by a general act of statewide application.
This Court held in Opinion of the Justices No. 229, 342 So.2d 361 (Ala.1977), that existing Code sections governing the method of selecting juries in criminal cases would survive the ratification of Amendment No. 328 because of the provision in § 6.21(h) that "all provisions of law and rules of court in force on the effective date of this article [i.e., the new judicial article, as established by Amendment No. 328] shall continue in effect until superseded in the manner authorized by the Constitution." Pertinent to the present analysis was the Court's explanation that "[t]he provisions of law relative to the selection of juries has not been superseded `in the manner authorized by the Constitution'  that is, by a rule promulgated by the Supreme Court." 342 So.2d at 362. Therefore, we reject the argument of DaSilva's estate that "[t]his Court has long held that once the Legislature acts in the field of procedure, its enactments trump any inconsistent actions by the Court, whether the Legislative action is before or after the Court promulgates a Rule." (Brief of DaSilva's estate, p. 34.) (Emphasis added.)

IV. Section 12-1-1, Code of Alabama 1975

The Legislature, as the author of § 6.11, which it subsequently put before the people for approval, confirmed its understanding of that power vested in this Court when, a little more than three years after Amendment No. 328 was approved and ratified, it enacted § 12-1-1 as a part of the Code of Alabama 1975, expressly providing that "[a]ny provisions of [Title 12 of the Code] regulating procedure shall apply only if the procedure is not governed by the Alabama Rules of Civil Procedure, the Alabama Rules of Appellate Procedure, or any other rule of practice and procedure as may be adopted by the Supreme Court *237 of Alabama." Thus, the Legislature acknowledged that any provision of any statute "regulating procedure" was, or could be, trumped by any rule of practice and procedure adopted by this Court, a process directly contrary to Venator's expansive reading of § 21 of the Constitution. Of course, as already discussed, the "prospective field of operation" of § 12-1-1 would run afoul of the concluding sentence of § 6.11 if taken to its furthest reach to block forever any legislative changes of court-adopted rules of practice and procedure. Nonetheless, the holding in Ex parte Stewart, supra, reined in § 12-1-1 only "to the extent [prospective application of the statute] would never allow a statute enacted after [§ 6.11's] effective date to override a rule of court ...." 730 So.2d at 1249. The prospective application of § 12-1-1, which Stewart recognizes, is otherwise unaffected.

V. Substantive Rights

As noted, § 6.11 not only constitutionally confirms the power and authority of this Court to make rules governing the administration of, and practice and procedure in, all courts, but it also mandates that this Court make such rules. The only limitation on that power and authority, as pertinent to the matters now under consideration, is that "such rules shall not abridge, enlarge or modify the substantive right of any party." Thus, by virtue of the terminology employed in § 6.11, we must determine in the first instance, whether the Court's abrogation of the Dead Man's Statute abridges, enlarges, or modifies the substantive rights of any party.

VI. The Dead Man's Statute  Its Purpose and Effect

Venator and DaSilva's estate both argue that the Dead Man's Statute should be viewed as a substantive rather than a procedural statute and, therefore, not susceptible to change by court rule. They argue that the Dead Man's Statute has the substantive effect and purpose of protecting the estates of decedents. "Testimony is prohibited only when the deceased's estate is affected in a negative way. Stephens v. Stephens, 680 So.2d 329, 332 (Ala.Civ.App.1996)." (Venator's brief, p. 39.) "The Alabama Dead Man's Statute vests substantive rights in an estate, and those rights can only be taken away by the Alabama Legislature. ... The statute was enacted to protect the estates of decedents. Williams v. Williams, 497 So.2d 481, 484 (Ala.1986)." (Brief of DaSilva's estate, p. 38.) DaSilva's estate argues that the Dead Man's Statute "is not designed to further the fact-finding or truth-finding function of the trial process," but rather "was designed by the Legislature to safeguard the assets of estates from unmeritorious claims." (Brief of DaSilva's estate, pp. 41-42.)
A review of the origins and purposes of dead man's statutes in general, and the Alabama statute in particular, reveals those assertions to be overstatements.
"Early common law courts concluded that an interested witness was likely to be untruthful and, therefore, should not be heard. This preclusion applied to civil parties, criminal defendants and interested third-party witnesses. The rationale underlying such disqualification was perhaps best described by Dean Wigmore:
"`The theory of disqualification by interest was merely one variety of the general theory which underlay the extensive rules of incompetency at common law. It was reducible in its essence to a syllogism, both premises of which, though they may now seem fallacious enough, were accepted in the 1700s as axioms of truth: Total exclusion from the stand is the proper safeguard against a false decision, *238 whenever the persons offered are of a class specially likely to speak falsely; persons having a pecuniary interest in the event of the cause are specially likely to speak falsely; therefore such persons should be totally excluded.'16
"16 2 [John H.] Wigmore, [Evidence] § 576, at 810 [(Chadbourn rev.1979)]."
Joseph A. Colquitt & Charles W. Gamble, From Incompetency to Weight and Credibility: The Next Step in an Historic Trend, 47 Ala. L.Rev. 145, 147-48 (1995) (some footnotes omitted).
"The genesis of the Dead Man's Statute dates back to the sixteenth century English common law. At common law, a party could not testify on his or her own behalf, nor be compelled to testify by an adversary. During the mid-nineteenth century, there was a movement to abolish the common law rule disqualifying parties to a lawsuit as witnesses. In 1843, the English Parliament abolished the disqualification of testimony by interested parties.
"America followed suit, and when the common rule was changed so that a party to litigation could testify, it became apparent that, if the other party to the litigation were dead, the living party had an opportunity to slant the evidence in his or her own favor. In order to reduce the risk of perjury, Dead Man's Statutes were enacted by the majority of states to balance the scales by barring the testimony of all parties to a suit having a direct pecuniary or proprietary interest in its outcome. The rationale for this rule was that it was the best method of securing the truth to disqualify certain classes of witnesses who were apt to speak falsely from giving testimony. It was said to balance the scales: death had sealed the lips of the decedent and the statute would seal the lips of the witnesses who would testify regarding conversations or transactions with the decedent."
Herbert E. Tucker, Colorado Dead Man's Statute: Time for Repeal or Reform?, 29 Colo. Law. 45, 45 (January 2000) (footnotes omitted).
The Dead Man's Statute is "to be construed in light of the common-law rule that all persons who were parties to the record, or had a pecuniary interest in the result of the suit, were incompetent to testify." Mobile Sav. Bank v. McDonnell, 87 Ala. 736, 740, 6 So. 703, 704 (1889). "We have often said, that the purpose and policy of the statute are to exclude the living from testifying against the dead, because the latter can not be heard in contradiction. A contrary rule would open broad the door to the entry of innumerable frauds." Id. From its earliest enactment, as § 2704, Code of 1867, the Dead Man's Statute has declared broadly that "there must be no exclusion of any witness because he is a party or interested in the issued tried," subject to an exception relating to any transaction with, or statement by, a deceased person whose estate is interested in the result of the suit. § 12-21-163, Ala.Code 1975. The formulation of the rule in the Code of 1867 read:
"§ 2704. (2302a) Competency as affected by interest.  In suits and proceedings before any court or officer, other than criminal cases, there must be no exclusion of any witness, because he is a party or interested in the issue tried, except that in suits or proceedings by or against executors, or administrators, (as to which a different rule is not made by the laws of this state,) neither party shall be allowed to testify against the other, as to any transaction with, or statement by the testator, or intestate, unless called to testify thereto by the opposite party."
*239 Section 3058 of the Code of 1876 carried this reformulation of the rule:
"Competency as affected by being a party, or having an interest.  In suits and proceedings before any court or officer other than criminal cases, there must be no exclusion of any witness because he is a party, or interested in the issue tried, except that neither party shall be allowed to testify against the other, as to any transaction with, or statement by, any deceased person whose estate is interested in the result of such suit, or when such deceased person, at the time of such statement or transaction, acted in any representative or fiduciary relation whatsoever to the party against whom such testimony is sought to be introduced."
As can be seen, the revised version applied in any civil action or proceeding, rather than in just an action "by or against executors, or administrators." In the revised version, neither party could be allowed to testify against the other as to any transaction with or statement by "any deceased person whose estate is interested in the result of such suit," rather than just a transaction with or statement "by the testator, or intestate," and statements or transactions of a deceased person were implicated "when such deceased person, at the time of such statement or transaction, acted in any representative or fiduciary relation whatsoever to the party against whom such testimony is sought to be introduced."
The only subsequent changes of significance were effected by the Code of 1896, § 1794, where the type of prohibited witness was expanded from just a party to any "person having a pecuniary interest in the result of the suit or proceeding...." The preclusion would not apply if the testimony of the deceased person relating to the subject transaction or statement was introduced in evidence by the party whose interest was opposed to that of the witness, or the testimony had been taken and was on file in the cause; and no incompetent witness could make himself competent by transferring his interest to another. That version of the Dead Man's Statute has been carried forward in successive Codes without change (§ 4007, Code of 1907; § 7721, Code of 1923; Title 7, § 433, Code of 1940; and § 12-21-163, Code of 1975). Thus, "[t]he statute enlarges to some extent the former [common-law] rule of competency, or, what is the same thing, narrows the old rule of exclusion; but it `preserves the common-law rule as to the class of excepted cases.'" Mobile Sav. Bank, 87 Ala. at 740, 6 So. at 704.
"[T]he common-law rule shall be abolished, which excluded a witness from testifying because he was a party to the record, or interested in the issue tried; and hereafter, generally, both parties and interested persons shall be competent witnesses, except in certain cases.... We repeat, by way of lending emphasis to the fact, that, as to the class of statutory exceptions, the common-law rule is preserved, and not abrogated, and that rule generally makes parties to the record incompetent."
Id.
Thus, in enacting the Dead Man's Statute, the Alabama Legislature was seeking to liberalize court-created rules of witness competency, while at the same time attempting to control a perceived fertile field for perjury. The policy and purpose of the statute were remedial. Kumpe v. Coons, 63 Ala. 448, 456 (1879); Kemp v. Kroutter, 531 So.2d 854, 857 (Ala.1988).
In furtherance of that policy and purpose, it was declared early on that the statute must be applied to afford reciprocal or "mutual" protections to the living and dead alike:

*240 "[T]he purpose of the exception in the statute was to prevent a living party from establishing, by his own evidence, a right in himself, against the dead, who could not be heard in answer to him; and to remove the temptations to fraud and perjury, which the opportunity of testifying without the fear of contradiction would afford.... In the operation of the rule of exclusion, there must be mutuality. If the party is excluded from establishing a claim in his own favor against the dead, those who have succeeded to the rights of the dead, and stand to the living in the relation of adverse suitors, must not be permitted to fix on him a liability to the dead, which he cannot repel by his own evidence."
Harwood v. Harper, 54 Ala. 659, 667-68 (1875).
This principle and purpose of "mutuality" is emphasized time and again in the caselaw of this Court.
"The great purpose [of the statute is] to enlarge the competency of witnesses, to remove interest, or relation to the suit or proceeding, as a disqualification.... There is an exclusion only of evidence of a particular character  of transactions with, or statements by, any deceased person, whose estate is interested in the result of the suit. The reason of the exception of evidence of this character, it has often been said, is, `that when there is no mutuality, there should be no admissibility  i.e., when the lips of one party to a contract are closed by death, then the other party should not be heard as a witness.'  1 Whart. Ev. § 463."
Kumpe, 63 Ala. at 454-55. See also Davis v. Tarver, 65 Ala. 98 (1880); Boykin v. Smith, 65 Ala. 294 (1880); and Hodges v. Denny, 86 Ala. 226, 5 So. 492 (1889).
In McDonald v. Harris, 131 Ala. 359, 31 So. 548 (1901), a physician sought to recover from the executor of the estate of his deceased patient the value of medical services rendered to the deceased during his lifetime. The defendant executor, the son of the deceased patient, set up the defense that the services had not been rendered in a skillful and competent manner, and sought to prove through his own testimony and that of his mother certain transactions between the plaintiff and his patient, and statements made by each in connection with the same. The son and widow were heirs of the decedent and distributees of his estate, and thereby had a pecuniary interest in the result of the suit, which interest was opposed to that of the plaintiff, against whom they were called to testify by the estate. Their testimony was thus offered in an attempt to protect the estate. The trial court excluded their testimony as incompetent under the Dead Man's Statute, however, and, following a judgment in favor of the plaintiff, the executor appealed. A unanimous Court explained the full import of the principle of "mutuality":
"It is palpable that, by the very letter of the statute, they were incompetent to testify to the transactions and statements in question. Code [of 1896], § 1794. And it would be unnecessary to say more in justification of their exclusion by the trial court as witnesses as to these matters, but for an expression in the opinion of this court in the case of Austin v. Bean, 101 Ala. 133, 147, 16 South. 41, 45 [(1894)], where it is said by Head, J.: `The exception as to competency mentioned in the statute is for the protection of the estate of the deceased and those claiming under him, and does not contemplate that the adversary of the estate, in a suit or proceeding, may object to the competency of witnesses called by the representatives of the deceased in such suit or *241 proceeding to prove transactions with or statements made by him.' Where legislative purpose is clearly expressed, as in this statute, there can be no occasion for looking beyond the terms employed for a contemplation on the part of the lawmakers which would exclude from its operation cases plainly within its language. The effect of a statute is to be determined by its own terms, when they are clear and unambiguous and within organic competency, and not upon considerations of the wisdom of excluding this or that state of facts from the field of its operation. The proposition quoted above from the opinion in Austin v. Bean, is opposed to the statute as it is plainly written; and this is all there is necessary to say in repudiation of it. But it is also opposed to the rationale of the enactment in its application to cases like this one. Under it, the plaintiff's mouth would be closed as to transactions with and statements by the deceased, while those interested in the estate would be free to detail such transactions and statements in violation of the manifest policy of the statute to seal the lips of all parties interested in the result of the suit when the lips of one of them have been sealed in consequence of the death of an original party to the transaction. The court committed no error in excluding the proposed testimony of [the son and the widow] as to transactions between [the physician] and the deceased, and statements made by the latter. Adler v. Pin, 80 Ala. 351 [(1885)]; Dunlap v. Mobley, 71 Ala. 102 [(1881)]."
McDonald v. Harris, 131 Ala. at 364-65, 31 So. at 549.
Thus, the Court made clear that the exclusionary effect of the Dead Man's Statute "cut[ ] both ways," and its purpose and effect were not invariably to protect the estate or those interested in it. Rather, the offered witness (originally either "a party or [a person] interested in the issue tried," and, commencing in 1896, any "person having a pecuniary interest in the result of the suit or the proceeding") could not testify against the party to whom his interest was opposed. Therefore, in any instance where an estate needed to establish a claim asserted by it, or to defend a claim asserted against it, it was not allowed to do so by calling a person having a pecuniary interest in the result of the action or proceeding to testify against the party to whom his interest was opposed as to any transaction with, or statement by, the deceased person whose estate was interested in the result of the action or proceeding (or where the deceased, at the time of the transaction or statement, was acting in any representative or fiduciary relation to the other party).
Accordingly, the Court held in Qualls v. Monroe County Bank, 229 Ala. 315, 156 So. 846 (1934), that, in an action by the payee of a promissory note against the administrator of the estate of the deceased alleged maker of the note, a son of the decedent who was also an heir, was not competent to testify that his father had stated that he would not sign the note. "The well-defined purpose of the law is to seal the lips of living parties where death has sealed the lips of others." 229 Ala. at 316, 156 So. at 847.
Likewise, it was error in another case for the trial court to allow the widow of a deceased whose estate was interested in the action and who herself had an interest in the result of the suit to testify as to statements made by her husband. "It is a mistaken construction of the statute to assume that it does not prohibit the testimony if it is favorable to the interest of the estate, and the witnesses is called in behalf *242 of such interest." Pfingstl v. Solomon, 240 Ala. 58, 63, 197 So. 12, 16 (1940).
The proposition of mutuality was revisited, and emphatically so, in Niehuss v. Ford, 251 Ala. 529, 532, 38 So.2d 484, 487 (1949):
"But the question arises of whether the statute bars a witness who is an heir of the estate and proposes to testify in respect to such transaction in the interest of his purchaser, who has succeeded to the interest of the estate.
"In the case of McDonald v. Harris, 131 Ala. 359, 31 So. 548 [(1901)], the Court overruled Austin v. Bean, 101 Ala. 133, 137, 16 So. 41 [(1894)], which had held that the statute ([Title 7,] section 433, [Code of 1940]) is for the protection of the estate of decedent and those claiming under him, and further that it does not contemplate that the adversary of the estate may object to the competency of a witness called by the representative of the estate to prove a transaction with decedent, and in overruling it held that those interested in the estate could not detail transactions by their deceased ancestor, since the plaintiff's mouth is closed in that respect.
"In Adler v. Pin, 80 Ala. 351 [(1885)], it is said the rule of exclusion extends to both the adversary parties. The same principle was applied in Watson v. Appleton, 183 Ala. 514, 62 So. 765 [(1913)], and Qualls v. Monroe County Bank, 229 Ala. 315, 156 So. 846 [(1934)].
"In some cases, where that question was not involved, it was sometimes said that the statute is for the protection of the estate of decedent, implying it is thought that it is not to protect the living party. But it cannot be used by the representative of the estate of decedent as a club against which the living cannot defend. Since he cannot testify against the estate's representative, the latter should not and cannot testify against the living party. `A party to a contract made with a decedent is not competent to testify thereto as a witness for persons claiming under him as against the heirs of decedent.' Barnes v. White, [195 Ala. 588, 71 So. 114 (1916)]. And this protects purchasers under decedent as well as heirs. Jernigan v. Gibbs, [206 Ala. 93, 89 So. 196 (1920)]. The evidence cannot by the terms of statute be used against a party to whom the interest of the witness is opposed, unless called to testify by the one to whom such interest is opposed. Section 433, Title 7, Code. The statute does not say that it cannot be used against the estate of the deceased, but against a party whose interest is opposed to that of the witness. Reference was made to that principle on the basis of those cases in Pfingstl v. Solomon, 240 Ala. 58, 197 So. 12 [(1940)]."
(Emphasis supplied.)
Likewise, in Livingston v. Powell, 257 Ala. 38, 44-45, 57 So.2d 521, 526 (1952), the Court again explained that it was a misconception of the effect of the Dead Man's Statute to consider it solely for the benefit of the estate, "although there are some cases which loosely make that statement when it was not necessary to do so," citing Niehuss, supra, and Pfingstl, supra.
More recently, in Taylor v. First National Bank of Tuskaloosa, 279 Ala. 624, 189 So.2d 141 (1966), the trial court was held to have erred in allowing, in an action brought by the executor of a deceased testator against one of the testator's daughters, the testimony of his widow and two other daughters concerning statements made by the testator relating to the transaction in controversy. In effect, persons having a pecuniary interest in the result of the action or proceeding were allowed to testify against the party to *243 whom their interest was opposed as to a transaction with, or statement by, the deceased person whose estate was interested in the result of the action. The Court reiterated, "it is a mistaken construction of the statute to assume that it does not prohibit the testimony if it is favorable to the interest of the estate, and the witness is called in behalf of such interest." 279 Ala. at 630, 189 So.2d at 146.
Citing Taylor, supra, the Court stated in DeShazo v. Miller, 346 So.2d 423, 426 (Ala.1977):
"The following four questions paraphrase this statute and an affirmative reply to each of the questions means that the Deadman's Statute applies and the witness is not competent to testify: (1) Will the testimony concern a statement by or a transaction with a deceased person? (2) Will the estate of this deceased person be affected by the outcome of the suit? (3) Does the witness have a pecuniary interest in the result of the suit? (4) Is the interest of the witness opposed to the interest of the party against whom he is called to testify?"
The Court compressed that analysis somewhat in Bank of the Southeast v. Koslin, 380 So.2d 826, 829 (Ala.1980), stating:
"In order for the dead man's statute to disqualify a witness from testifying about his dealings with a deceased individual, three criteria must be met: (1) the estate of the deceased must be interested in the outcome of the suit; (2) the witness must have a pecuniary interest in the result of the proceedings; and (3) the testimony of the witness must relate to a personal transaction with the decedent. Taylor v. First National Bank of Tuskaloosa, 279 Ala. 624, 189 So.2d 141 (1966)."
Unfortunately, the Court got somewhat "off track" a couple of years later when, in Lavett v. Lavett, 414 So.2d 907, 911 (Ala.1982), overruled on other grounds, McBride v. McBride, 548 So.2d 155 (Ala.1989), it stated:
"The dead man's statute excludes testimony only if four criteria are met:
"(1) The testimony concerns a transaction or statement with a deceased person.
"(2) The estate of the deceased will be affected by the outcome of the suit.
"(3) The witness has a pecuniary interest in the suit.
"(4) The interest of the witness is adverse to the deceased person or his or her estate.

"See Bank of the Southeast v. Koslin, 380 So.2d 826 (Ala.1980). DeShazo v. Miller, 346 So.2d 423 (Ala.1977)."
(Emphasis supplied.)
This phrasing of the fourth criterion was appropriate to the case at hand, but only because the party against whom the witness was called to testify was in fact "the deceased person or his or her estate." As noted, the proper and "neutral" expression of this criterion, true to the wording of the statute itself, is, as expressed in DeShazo, 346 So.2d at 426: "Is the interest of the witness opposed to the interest of the party against whom he is called to testify?" It was not even necessary to attempt a statement of this fourth criterion in Lavett, because the Court first held, for reasons totally independent of any of the criteria, that the statute was inapplicable under the procedural circumstances of the case, and, further, in regard to the third criterion, that the witness in question did not have a pecuniary interest in the action. Although the case-specific phrasing of the fourth criterion was of no consequence in Lavett because that particular factor was never "in play" in it, that phrasing of the fourth criterion was carelessly picked up and perpetuated *244 as a part of the listing of the criteria in some subsequent cases in which only one or more of the other criteria were pertinent to a disposition, or in which indeed it was the estate which was the party against whom the witness was called to testify.
Thus, by way of rote repetition, the Lavett phrasing was included in the listing of the criteria in Staik v. Jefferson Federal Savings & Loan Association of Birmingham, 434 So.2d 763, 766 (Ala.1983), with a citation to only Lavett. It was then included in Lett v. Watts, 463 So.2d 138, 142 (Ala.1984), with a citation to only Staik. Edwards v. Vanzant, 492 So.2d 990, 993 (Ala.1986), repeated the listing, citing Lett, but also, and inappropriately insofar as the phrasing of the fourth factor, to Koslin, supra, and Taylor, supra. Next Williams v. Williams, 497 So.2d 481, 483 (Ala.1986) (now cited by DaSilva's estate, as noted above), repeated the listing, citing Lett and Lavett. Likewise, in McDaniel v. Laminack, 603 So.2d 1010, 1012 (Ala.1992), the listing was given, citing only Edwards. Recently, the listing was repeated by the Court of Civil Appeals in Stephens v. Stephens, 680 So.2d 329, 332 (Ala.Civ.App.1996) (now cited by Venator, as noted above). In Stephens, the trial court's exclusion of certain testimony based on the Dead Man's Statute was deemed error because the witness actually had no pecuniary interest in the outcome of the suit and, alternatively, any type of interest he arguably did have was not adverse to the estate's at the time of the transaction and statements at issue. The "interest" of the witness, such as it was, therefore, was not adverse to the party against whom he was called to testify, i.e., the trustee of a trust established by the deceased during his lifetime.
Obviously, because the focus of each of those cases was on another of the criteria or the estate was indeed the party against whom the witness was called to testify, the unilateral, as opposed to mutual, statement of the fourth criterion was innocuous in those cases. We take this opportunity, however, true to the teaching of McDonald, Qualls, Pfingstl, Niehuss, Livingston, Taylor, and DeShazo, supra, to emphasize that the Dead Man's Statute was designed to prohibit, neutrally, and with "mutuality," a person having a pecuniary interest in the result of the action or proceeding from testifying "against the party to whom his interest is opposed" as to any transaction with, or statement by, the deceased person whose estate was interested in the result of the proceeding, or who acted as a representative or fiduciary for the party against whom the testimony is sought to be introduced. Sometimes the protected party would be "the decedent or his estate," but other times it would be the party adverse to the estate, and at those times the interest of the deceased or the estate would not be favored by application of the statute, but rather would be prejudiced.
The principal purpose of the Dead Man's Statute was to further the fact-finding or truth-finding function of the trial process by eliminating a particularly tempting opportunity for perjury. Further evidencing that fact is that portion of the statute providing that
"no person having a pecuniary interest in the result of the action or proceeding shall be allowed to testify against the party to whom his interest is opposed as to any transaction with, or statement by, the deceased person ... when such deceased person, at the time of such transaction or statement, acted in any representative or fiduciary relation whatsoever to the party against whom such testimony is sought to be introduced...."
*245 This provision is apparently unique to Alabama; certainly no contemporary dead man's statute in another jurisdiction incorporates a similar feature.
In Beddingfield v. Central Bank of Alabama, N.A., 440 So.2d 1051 (Ala.1983), a bank customer sued the bank asserting various claims arising out of an alleged kickback scheme perpetrated by a former officer of the bank before his death, pursuant to which he allegedly extorted some $9,000 from the customer. Because the deceased officer had clearly acted in a representative relation to the bank at the time of his alleged transactions with the customer, and because only the two of them had been present during the transaction, this particular portion of the Dead Man's Statute served to exclude the customer's testimony, leaving him without any means of proving his allegations, resulting in the entry of a summary judgment in favor of the bank. On appeal, the customer contended that the Dead Man's Statute, as thus applied, was unconstitutional because, he argued, it deprived him of equal protection and due process under both the United States Constitution and the Alabama Constitution and it contravened his right of redress guaranteed by the Alabama Constitution. There being no suspect classification or fundamental right involved, however, this Court was called upon to determine only whether the classification furthered a proper governmental purpose and whether it was rationally related to that purpose. 440 So.2d at 1053. The Court noted that the Court in McCrary's Adm'r v. Rash's Adm'r, 60 Ala. 374 (1877), had discussed the purpose of the subject portion of the statute, stating that it
"`was to exclude the testimony of parties to the suit, when offered in their own behalf, to show transactions with, or statements by persons who have died, and consequently can not confront, and, perchance, contradict such testimony. It rests on the fear that personal interest will exercise an influence too controlling, unless it is confronted by an adversary interest, having equal knowledge of the facts. This exception has been uniformly upheld in its integrity, as a necessary restraint of abuses likely to grow out of the section of the Code we are considering.'"
440 So.2d at 1053 (quoting McCrary's Adm'r, 60 Ala. at 377).
Applying a "rational basis" analysis to the statute, this Court found that it "furthers a proper governmental purpose and the provisions of the statute are rationally related to that purpose." 440 So.2d at 1053. Consequently, the statute was upheld against the constitutional challenge and applied to affirm the summary judgment in favor of the bank, even though the estate of the deceased bank officer was not a party to the action.
Similarly, in Moseley v. Lewis & Brackin, 583 So.2d 1297 (Ala.1991), Moseley, a defendant sued by a law firm for legal fees, defended on the basis that one of the partners in the firm, Roy Lewis, who died before trial, had orally agreed that the firm would look to others for payment of its fees. The trial court excluded Moseley's testimony concerning that alleged oral agreement and, following an adverse jury verdict, Moseley appealed.
"Moseley contends that there was no evidence that showed that Lewis's estate would be affected by the testimony he attempted to offer and, therefore, he argues, § 12-21-163 had no application. We do not agree. This Court has held that the Dead Man's Statute operates to exclude testimony regarding statements by deceased officers of defendant business entities. Richter v. Central Bank of Alabama, N.A., 451 So.2d 239 (Ala. *246 1984); Scott v. Southern Coach & Body Co., 280 Ala. 670, 197 So.2d 775 (1967). In addition, this Court has recognized that the very language of the Dead Man's Statute requires the exclusion of testimony regarding an officer or representative's statements if that officer is now deceased and was acting in his representative capacity at the time the alleged statement was made, notwithstanding the fact that the officer's estate will not be affected by the suit:
"`[T]he statute ... makes such testimony incompetent, though the estate of the deceased person is not interested in the result of the suit, if he acted in a representative or fiduciary relation to the party against whom such testimony is offered.'
"Busby v. Truswal Systems Corp., [596 So.2d 562] (Ala.1991); Benson & Co. v. Foreman, 241 Ala. 193, 195, 1 So.2d 898, 899 (1941) (construing Ala.Code 1923, § 7721, a predecessor to § 12-21-163). Because Lewis was acting in his capacity as a partner in Lewis & Brackin when the alleged statement was made, Moseley's testimony was properly excluded."
583 So.2d at 1299.
See, to like effect, Power Equip. Co. v. First Alabama Bank, 585 So.2d 1291 (Ala.1991); Campbell v. Colonial Bank, 583 So.2d 236 (Ala.1991), and Richter v. Central Bank of Alabama, N.A., 451 So.2d 239 (Ala.1984).
Accordingly, it is clear that the primary policy and purpose behind Alabama's Dead Man's Statute was the avoidance of the incentive and opportunity for perjury that would exist if the sole surviving witness to statements of, or a transaction with, a deceased person were to be allowed to testify to the statements or transaction without limitation. "The purpose of Alabama's Dead Man's Statute was an attempt to aid the factfinder's truth-seeking function." Colquitt & Gamble, 47 Ala. L.Rev. at 153. Protection of the estate of the deceased, while often the result of application of the statute, was not its primary purpose; application of the statute could equally serve to prejudice the estate, and it applied to protect a business or other employer in litigation involving a transaction of a deceased employee even though the employee's estate was not interested in the result of the litigation.

VII. Practice and Procedure Versus Substantial Rights

A. Views of the United States Supreme Court and Legal Scholars

The phrasing of § 6.11 closely parallels, in pertinent part, that of the Rules Enabling Act, 28 U.S.C. § 2072, pursuant to which Congress delegated rulemaking power to the United States Supreme Court. As it read at the time of Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Rules Enabling Act empowered the Supreme Court" `to prescribe, by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts,'" with the caveat that "`[s]uch rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury ....'" 380 U.S. at 464, 85 S.Ct. 1136. The Supreme Court observed in Hanna that "[t]he line between `substance' and `procedure' shifts as the legal context changes. `Each implies different variables depending upon the particular problem for which it is used.' Guaranty Trust Co. of New York v. York, 326 U.S. [99] at 108[, 65 S.Ct. 1464, 89 L.Ed. 2079] [(1945)]; Cook, The Logical and Legal Bases of the Conflict of Laws, pp. 154-183 (1942)." 380 U.S. at 471, 85 S.Ct. 1136.

*247 "The substance versus procedure issue arises in four contexts: (1) in application of the conflicts of laws rule that the procedural law of the forum must be applied; (2) in determining whether a retrospective criminal statute is substantive and, therefore, an invalid ex post facto law; (3) under the Erie Doctrine when a federal court is asked to apply a state law; and (4) when the power of a court or legislature to make rules is in issue."
Terry A. Moore, Does the Alabama Supreme Court Have the Power to Make Rules of Evidence?, 25 Cumb. L.Rev. 331, 346 n. 96 (1994-1995).
"The distinction between procedure and substance is made for a variety of legal purposes. It is made, for example, in determining the reach of the law's prohibition against ex post facto laws and in the application of principles governing choice-of-law issues. It is also made in resolving disputes over whether federal or state law should govern in federal diversity of citizenship cases and, most importantly for our purposes, in determining limits of the judiciary's power to make rules of court. [Walter Wheeler] Cook warned against an assumption that substance and procedure have universal meanings for all purposes, [`Substance' and `Procedure' in the Conflict of Laws, 42 Yale L.J. 333 (1933)].... No one suggests that decisions rendered for one purpose are meaningless with respect to another, only that `what may be considered procedural for one purpose may be considered substantive for another' [Charles W. Joiner & Oscar J. Miller, Rules of Practice and Procedure: A Study of Judicial Rule Making, 55 Mich. L.Rev. 623, 635 (1957)]."
Robert G. Lawson, Modifying the Kentucky Rules of Evidence  A Separation of Powers Issue, 88 Ky. L.J. 525, 552-53 (1999-2000)(footnotes omitted). A quarter of a century before Hanna, the Supreme Court, in determining whether two federal rules of civil procedure should be invalidated as abridging, enlarging, or modifying substantive rights, stated:
"The test must be whether a rule really regulates procedure,  the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them."
Sibbach v. Wilson & Co., 312 U.S. 1, 14, 61 S.Ct. 422, 85 L.Ed. 479 (1941).
In Burlington Northern R.R. v. Woods, 480 U.S. 1, 5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987), the Court observed that
"[t]he cardinal purpose of Congress in authorizing the development of a uniform and consistent system of rules governing federal practice and procedure suggests that Rules which incidentally affect litigants' substantive rights do not violate [the provision of the Rules Enabling Act that the rules not abridge, enlarge, or modify any substantive right] if reasonably necessary to maintain the integrity of that system of rules."
Concurring in Hanna, Justice Harlan wrote specially to state that
"[t]o my mind the proper line of approach in determining whether to apply a state or a federal rule, whether `substantive' or `procedural,' is to stay close to basic principles by inquiring if the choice of rule would substantially affect those primary decisions respecting human conduct which our constitutional system leaves to state regulation."
380 U.S. at 475, 85 S.Ct. 1136 (Harlan, J., concurring).
This approach has its advocates. Professor Ely states that "in attempting to give content to the notion of substance, the *248 literature has focused on `those rules of law which characteristically and reasonably affect people's conduct at the stage of primary private activity.' [H. Hart & H. Wechsler, The Federal Courts and the Federal System 686, 678 (1953)]." John Hart Ely, The Irrepressible Myth of Erie, 87 Harv. L.Rev. 693, 725 (1974). Professor Dudley suggests the line of demarcation between substance and procedure as being between rules "designed to affect behavior outside the courtroom" and rules designed "to enhance the accuracy of the fact-finding process." Earl C. Dudley, Jr., Federalism and Federal Rule of Evidence 501: Privilege and Vertical Choice of Law, 82 Geo. L.J. 1781, at 1781, 1797 (1994). A rule is substantive "even if its purposes are entirely procedural, if it is calculated to affect behavior at the planning as distinguished from the disputative stage of activity." Olin Guy Welborn III, The Federal Rules of Evidence and the Application of State Law in the Federal Courts, 55 Tex. L.Rev. 371, 404 (1977). "For purposes of the Rules Enabling Act, when a rule of law is one which would affect a person's conduct prior to the onset of litigation and has no design to manage ongoing litigation, it is rule of substance rather than procedure." 32 Am.Jur.2d Federal Practice & Procedure § 399 (1995) (footnotes omitted).
Another approach is to analyze the purpose of the evidentiary statute or rule. "The foremost problem with the [`purpose' test] involves its central assumption that every rule of evidence is based on a single purpose, either substantive or procedural. However, this assumption ignores the fact that many evidentiary rules promote two or more purposes." Moore, 25 Cumb. L.Rev. at 347 (footnotes omitted).
"Scholars have traditionally treated rules of evidence whose primary objective is to enhance the accuracy of the fact-finding process as fundamentally adjective or procedural in character. By contrast, evidentiary rules that predominately serve other goals  such as the deterrence of official misconduct, the facilitation of consensual dispute resolution, or the preservation of the confidentiality of privileged relationships  have been viewed as substantive, even though some of the goals they serve are directly related to the litigation process."
Dudley, 82 Geo. L.J. at 1797 (footnotes omitted).
Still another approach is the "primary effects" test, which examines a rule to determine if it primarily affects substance or procedure.
"If the rule primarily regulates the truth-seeking function of the court, but only incidentally affects a legislative concern, then it is subject to judicial regulation. If its primary effect is the promotion of extrajudicial policies, and it has only incidental effects on the truth-seeking function of the courts, then the rule can only be prescribed by the legislature."
Moore, 25 Cumb. L.Rev. at 347-48 (footnotes omitted).
Another way of analyzing the substance versus procedure dilemma was proposed by Charles Anthony Riedl in his seminal article To What Extent May Courts Under the Rule-making Power Prescribe Rules of Evidence?, 26 A.B.A.J. 601, 604 (1940):
"The test we propose is whether a given rule of evidence is a device with which to promote the adequate, simple, prompt and inexpensive administration of justice in the conduct of a trial or whether the rule, having nothing to do with procedure, is grounded upon a declaration of a general public policy."
Moore, having discussed in his article the perceived shortcomings in these various *249 approaches, proposes an "historical test," which he explains as follows:
"[T]he extent of the court's constitutional rule-making power is measured by the reach of the exclusive legislative power to make laws. The court cannot make a rule governing an area of the law that traditionally only the legislature has been empowered to regulate. On the other hand, where an area of law has been traditionally controlled by both the courts and the legislature, the court is free to promulgate rules. Thus when it is said that the supreme court shall make and promulgate rules governing practice and procedure, what is meant is that the court cannot make rules regulating legislative subject matter, or substantive laws. Consequently, the test for determining the difference between substance and procedure for the purposes of allocating rule-making power is essentially this: Has the subject matter of the rule been traditionally exclusively regulated by the legislature? If it has, then the rule is substantive and outside of the scope of the court's rule-making power. If not, then the rule may be validly enacted by the court.
"....
"To clarify, the purpose of the historical test is to ensure that the Alabama courts never exert power over legislative subject matter. It is not formulated to test the authority of the legislature to enact rules of procedure. The legislature has plenary power to prescribe rules of practice and procedure and may change a rule of the court by an act of statewide application."
25 Cumb. L.Rev. at 350-51 (footnotes omitted).
Moore undertakes to analyze whether application of the historical test would yield a determination that the abrogation of the Dead Man's Statute by Rule 601 violates § 6.11:
"Application of the historical test can be broken down into two steps. First, the subject matter of the rule must be discerned. A court using the historical test should make an initial determination of the category of evidence law the rule regulates. In this case, the court seeks to modify the rules relating to competency of witnesses. Once the subject matter of the rule has been determined, the court should then conduct a historical survey of the role of the judiciary in creating rules governing the subject matter. The court must ascertain whether the judicial branch has traditionally had the power to determine the competency requirement, or whether that power has exclusively resided in the legislature.
"Alabama case law is replete with decisions wherein the Alabama Supreme Court has regulated the competency requirements. The courts frequently asserted a power to create and modify the rules determining whether a witness is competent to testify. Indeed, the courts created the original rule that a person interested in the outcome of the litigation could not testify in the trial of the case. The legislature substantially eliminated this rule when it passed the Dead Man Statute, with exception of suits involving the estate of a deceased. Since the courts created the rule that the legislation at least potentially preserved, it cannot be argued that the legislature exercised exclusive control over competency rules by passing the Dead Man Statute. Rather, in the past, both departments have exercised their authority to declare and modify the competency rules. In short, Alabama Rule of Evidence 601 is a procedural rule and not a substantive law and the court may constitutionally *250 supersede the Dead Man Statute."
25 Cumb. L.Rev. at 353 (footnotes omitted).

B. State Appellate Courts

The appellate courts of this state have had little occasion to address the issue of what constitutes substance, as opposed to procedure, in the rulemaking context, and no occasion to apply the distinction to the abrogation in Rule 601 of the Dead Man's Statute. In Holsemback v. State, 443 So.2d 1371 (Ala.Crim.App.1983), the Court of Criminal Appeals concluded that court rules controlling joinder and consolidation for trial of separately indicted defendants, adopted under the authority of § 6.11, dealt with "a matter of procedure and [do] not abridge the substantial right of an accused to a jury trial." 443 So.2d at 1376. As discussed, in Ex parte Ward, 540 So.2d 1350 (Ala.1988), this Court determined that the jurisdictional age limit of juveniles was a substantive issue. Also, we viewed the "method of selecting juries" to be within our rulemaking jurisdiction in Opinion of the Justices No. 229, 342 So.2d 361 (Ala.1977).
Other state appellate courts have considered the question more directly. "Most procedural rules may have some collateral substantive effect but do not become substantive in nature because of such indirect effect." Fehrenbach v. Fehrenbach, 42 Wis.2d 410, 413, 167 N.W.2d 218, 219-20 (1969).
"[I]t is simplistic to assume that all law is divided neatly between `substance' and `procedure.' A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account. Speaking of the proposition that a court may not promulgate rules governing substantive law in the exercise of their rule-making power, Professors Levin and Amsterdam agreed that `rational separation is well-nigh impossible.' `Legislative Control over Judicial Rule-making: A Problem in Constitutional Revision,' 107 U.Pa.L.Rev. 1, 14-15 (1958). See also State v. Otis Elevator Co., 12 N.J. 1, 24, 95 A.2d 715 (1953) (Jacobs, J., dissenting). As said in Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8, 16-17 (1965), `The line between "substance" and "procedure" shifts as the legal context changes. "Each implies different variables depending upon the particular problem for which it is used."' One context is conflict of laws; another is retrospective application of statutes; and a third is law-making, the subject at hand."
Busik v. Levine, 63 N.J. 351, 364-65, 307 A.2d 571, 578 (1973).
In Davis v. Hare, 262 Ark. 818, 820, 561 S.W.2d 321, 322 (1978), the Supreme Court of Arkansas declared that the Arkansas dead man's statute was "merely a rule of evidence and was therefore procedural in nature." Likewise, in Johnson v. Porter, 14 Ohio St.3d 58, 60, 471 N.E.2d 484, 487 (1984), the Supreme Court of Ohio concluded that its adoption of the counterpart to our Rule 601, providing that "[e]very person is competent to be a witness," with certain limited exceptions, served effectively to abrogate that state's dead man's statute. The court noted that it had previously stated that "rules of witness competency, are procedural and do not create, modify, or abridge substantive rights."
In Equitable Life Assurance Society of the United States v. McKay, 306 Or. 493, 760 P.2d 871 (1988), the Supreme Court of Oregon concluded that, for conflicts-of-laws purposes, under Oregon law Washington's dead man's statute should be regarded as "procedural," insofar as having to choose as between its being either "substantive" *251 or "procedural." The court quoted from Lilienthal v. Kaufman, 239 Or. 1, 6, 395 P.2d 543 (1964), its approval of following test from G. Stumberg's Principles of Conflict of Laws 133 (3d ed. 1963):
"[P]rocedural rules should be classified as those which concern methods of presenting to a court the operative facts upon which legal relations depend; substantive rules, those which concern the legal effect of those facts after they have been established."
306 Or. at 496, 760 P.2d at 873.
Venator and DaSilva's estate cite Electronic Planroom, Inc. v. McGraw-Hill Cos., 135 F.Supp.2d 805 (E.D.Mich.2001), as holding that a dead man's statute represented an enactment of substantive law, immune from abrogation under a court-adopted version of Rule 601. In that case the federal district court speculated that the intended abrogation of the Michigan dead man's statute by Michigan Rule of Evidence 601 would probably be deemed unavailing in that state because of the opinion by its Supreme Court in McDougall v. Schanz, 461 Mich. 15, 597 N.W.2d 148 (1999).
The district court's analysis of the implications of McDougall, even if sound, which we need not decide here, is of little practical application to the present case, because of the following distinguishing considerations: The Michigan Supreme Court has long held that the rulemaking authority is placed exclusively in its hands but that it must distinguish between practice and procedure, on the one hand, and substantive law on the other. The question in McDougall was whether a statute passed by the Michigan Legislature regarding expert testimony, enacted as a part of medical-malpractice reform, trespassed upon the Supreme Court's exclusive constitutional authority to promulgate rules regarding practice and procedure in Michigan courts. The McDougall court, overruling prior authority, established a new test whereby a statute addressing an evidentiary matter would be deemed to violate the court's constitutional rulemaking authority "only when' "no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified."'" 461 Mich. at 30, 597 N.W.2d at 156. The court concluded that "the statute does not involve the mere dispatch of judicial business," and, therefore, was not an unconstitutional infringement upon the supreme court's exclusive rulemaking authority over practice and procedure. 461 Mich. at 35, 597 N.W.2d at 159.
The district judge in Electronic Planroom concluded that the legislative policy reflected in the dead man's statute, that witnesses should not be permitted to "lie about the dead when the dead are no longer present to answer," related to a concern that "seemingly extends beyond the `mere dispatch of judicial business,' McDougall, 461 Mich. at 35, 597 N.W.2d at 158, and thereby renders [the statute] an enactment of substantive law which is not obligated by the conflicting Michigan Rule of Evidence 601." 135 F.Supp.2d at 816. In Alabama, this Court's rulemaking authority, shared with the Legislature, does not extend only to matters involving the "mere dispatch of judicial business."
More recently, in Maltas v. Maltas, 197 F.Supp.2d 409 (D.Md.2002), reversed on other grounds, 65 Fed. Appx. 917 (4th Cir.2003) (unpublished), a federal district court undertook this analysis:
"A state dead man's statute may be applicable in a diversity action in federal court pursuant to Federal Rule of Evidence 601, which states:
"`Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to *252 an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.'
"....
"The question of which state's dead man's statute applies in a diversity case can be a complicated one.... Specifically, there exists a scholarly debate as to how dead man's statutes should be classified: `Some scholars have said that dead man's statutes are substance, others have said that they are procedure, while still others have put them in the "twilight zone."' Robert G. Lawson, Modifying the Kentucky Rules of Evidence  A Separation of Powers Issue, 88 Ky. L.J. 525, 574 (2000).
"Plaintiff notes that two leading cases have reached contrary conclusions regarding the proper interpretation and application of Rule 601 when a federal district court applies the substantive law of a non-forum state and must therefore choose between two states' dead man's statutes. Compare Equitable Life Assurance Society of the United States v. McKay, 837 F.2d 904 (9th Cir.1988)(court should apply dead man's statute of forum state; such statutes are essentially procedural) with Amell v. Kucewicz, 53 F.Supp.2d 145 (D.Mass.1999)(court should apply dead man's statute of state whose rule of decision is applied; statute treated essentially as substantive).
"Maryland's dead man's statute provides as follows:
"`A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.'
"Md.Code Ann., Cts. & Jud. Proc. § 9-116 (1998). Maryland courts have not yet discussed the issue of whether the state dead man's statute is `procedural or `substantive.' Accordingly, `[w]here Maryland courts are silent or non-specific as to the applicable rule, "this court must apply a rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question."' Banca Cremi v. Alex. Brown, 955 F.Supp. 499, 522 (D.Md.1997) (citation omitted). Maryland's dead man's statute follows the traditional form and function. See Reddy v. Mody, 39 Md.App. 675, 388 A.2d 555, 558 [(1978)] (explaining that Maryland's dead man's statute `remains as a vestige of the common law disqualification' and that `[i]t carves from the rule rendering interested parties competent ... an exception which disallows a party from testifying to transactions with a deceased person'), cert. denied, 283 Md. 736 (1978); id. at 558-59 (explaining that the `general purpose of the Statute is to equalize the position of the parties' and that such a rule `renders as much testimony as possible admissible while preventing self-interested perjury').
"....
"... [T]he question is whether Maryland courts would categorize Maryland's dead man's statute as procedural (requiring that it apply in this case) or substantive (permitting its non-application in this case, as the substantive law *253 of Connecticut applies). It seems safe to say, if presented with the question, Maryland would consider the history of the dead man's statute, its own precedent, and the musings of other courts and treatises to determine whether a dead man's statute should ordinarily be characterized as procedural or substantive. If required to decide the issue, I would conclude that the Maryland Court of Appeals more likely than not would determine the statute to be procedural and thus apply the state dead man's statute to all cases tried in Maryland, notwithstanding the application of the substantive law of another state. See Wittel v. Baker, 10 Md.App. 531, 272 A.2d 57, 60 (1970) (explaining that a procedural statute is one that relates `solely to the remedy which may be employed to enforce or to protect a right which already exists')...."
197 F.Supp.2d at 423-25.

VIII. Application of the Various Tests

Under any of the various tests and approaches to discriminating between substance and procedure, we would conclude that abrogation of the Dead Man's Statute by Rule 601 represents a permissible exercise of this Court's constitutional rulemaking authority; the statute governs practice and procedure and does not abridge, enlarge, or modify the substantive right of any party. Certainly it does not affect the prelitigation conduct of a party. Also, as previously discussed, its predominant and paramount purpose is to aid the fact-finder's truth-seeking function by avoiding a particularly tempting potential for perjury. Its unique "representative or fiduciary relation" provision reflects that aim. Thus, truth seeking, not the protection of estates, is the primary purpose of the Dead Man's Statute; it only incidentally affects bogus claims against estates. Historically, witness competency was governed initially only by court-fashioned rules, and has only evolved into a shared area of rulemaking between this Court and the Legislature.

IX. "Silent" Subsequent Cases

The certified question, and Venator in its brief, point to two cases decided after the adoption of Rule 601 that fail to note the abrogation in Rule 601 of the Dead Man's Statute. In Smart v. Sandy Spring National Bank of Maryland (No. Civ.99-0336-AH-C, Feb. 23, 2000) (S.D.Ala.2000)(not published in F.Supp.2d), an unpublished opinion, the plaintiff in an action to quiet title to real property sought to establish his title through adverse possession by prescription. Attempting to avoid a summary judgment, he filed an affidavit asserting that he had had a conversation with a person now deceased, the predecessor in title of the defendant, during which the plaintiff had renounced his previous permissive use and asserted a right to the property. The district judge rejected this affidavit on the basis that it failed to indicate a date of the alleged conversation or to otherwise provide sufficient facts. "Plaintiff may not defeat Defendants' properly supported motion for summary judgment simply with an affidavit simply containing vague and conclusory allegations." Although that ruling was dispositive, the district judge opined that "[a]dditionally, Plaintiff's affidavit is suspect under the Alabama dead man's statute," and found "alternatively" that the affidavit was inadmissible under the Dead Man's Statute. No postjudgment motion was filed by either side and no appeal was taken. Obviously, the defendants had no reason to contest the "alternative" rationale, and the plaintiff presumably recognized that to do so would be an academic exercise, inasmuch as his affidavit *254 would remain rejected regardless. The reason the federal district judge took no note of Rule 601 of the Alabama Rules of Evidence is a matter about which we can only speculate; his failure to do so, without any analysis, or even acknowledgment of his awareness of the rule, does not provide persuasive authority to any degree in favor of Venator's position.
Venator also cites Evans v. Waddell, 689 So.2d 23 (Ala.1997), a case in which the Court applied the Dead Man's Statute to disallow the testimony of two witnesses. Rule 601 simply was not applicable to that case, however, because as the opinion explains, the action was filed in 1992 and the appeal was from a summary judgment entered on December 16, 1995. Rule 1103 of the Alabama Rules of Evidence expressly provides that the rules apply only to proceedings begun on or after January 1, 1996. Accordingly, there was no occasion for the Court to address Rule 601 in Evans.

X. Congressional Handling of the Federal Rules of Evidence

Section 28 U.S.C.A. § 2072 ("the Rules Enabling Act") presently reads, following amendments in 1988 and 1990:
"(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rule of evidence for cases in the United States district courts (including proceedings before magistrates thereof) and courts of appeals.
"(b) Such rules shall not abridge, enlarge, or modify any substantive right. All laws and conflict with such rules shall be of no further force or effect after such rules have taken effect.
"(c) Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title."
Venator and DaSilva's estate argue that the treatment given by Congress to the Rules of Evidence proposed by the United States Supreme Court, and to Rule 601 in particular, compels the conclusion that all dead man's statutes reflect substantive law and therefore are not amenable to abrogation by court rule. Our independent review persuades us that the considerations influencing the congressional reaction to proposed federal Rule 601 are not germane to the "procedural versus substantive" choice § 6.11 requires this Court to make. As originally proposed to Congress by the Supreme Court, Federal Rule of Evidence 601 consisted only of the first sentence of the rule eventually enacted: that sentence constitutes the Alabama version of Rule 601.
During the pertinent time frame, 1973-1975, dead man's statutes nationwide, unlike the Alabama version, generally excluded evidence only when offered against an estate and contained no provision for the exclusion of evidence where the estate of the deceased person was not interested in the outcome of the action. The broad sweep of the first sentence of Rule 601 was criticized in some quarters for failing to provide recognition in "diversity of citizenship" cases for state rules of evidence that might be perceived as substantive under the Erie Doctrine,[1] designed to prevent inappropriate displacement of a state's substantive law by federal rules.
Rather than accept the proposed rules of evidence promulgated by the Supreme Court, Congress intervened and amended various of the rules before enacting them in December 1974. In so doing, Congress insisted upon an adherence to state law in diversity cases by adding a second sentence *255 to Rule 601. That sentence reads: "However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law." Fed. Rule Evid. 601. Thus, state law was to be respected with respect to such evidentiary issues as presumption, privileges, and competency of witnesses.
One of the objections lodged against eliminating the effect of state dead man's statutes in diversity actions in federal court was that such a move would encourage forum shopping by allowing a plaintiff hemmed in by a state dead man's statute to avoid its effect by placing his case in federal court. "Now all the disappointed mistress has to do is to move her domicile to a neighboring state and perjure herself into a fortune." 27 Charles Allen Wright & Victor James Gold, Federal Practice & Procedure § 6001 (West 1990), quoting from a letter written to Congress by an attorney.
A second concern, principally advanced by the special constituency of those interests who managed decedent's estates, was that the protection afforded decedent's estates nationally by many dead man's statutes would be lost. Although the Federal Rules Advisory Committee argued that competency rules were procedural under Erie because they were merely rules bearing on witness credibility, the political clout of the opponents carried the day, even though some of them admitted that dead man's statutes were probably procedural under the Erie Doctrine. See Wright & Gold, supra, § 6002. "Congress did not have to care about whether Dead Man's Acts were more substantive than procedural; the Erie Doctrine gave Congress the power to treat such borderline issues as either procedural matters for federal control or substantive matters to be decided under state law. What Congress did care about was politics.... Solicitude for `state's rights,' the importance in our federal system of sometimes deferring to state substantive law, is the policy foundation for the second sentence of Rule 601." Id. (footnotes omitted). As Judge Weinstein has explained in his treatise:
"The Advisory Committee and most commentators had regarded these [dead man's] acts exclusively as relics of the party disqualification rule designed to prevent perjury, [whereas] those disagreeing felt `they might instead be viewed ... as reflecting an arguably substantive policy of protecting decedent's estates against fraudulent claims.'
"If viewed as a deterrent to perjury, the refusal to apply a state act in a federal court represents nothing more than a procedural disagreement as to which jurisdiction's rule is more likely to elicit the truth, a decision a federal court should be entitled to make for itself in the interest of developing a uniform and efficient mode of procedure. If the basic concern of the state, however, is not perjury but the protection of widows and incompetents against fraudulent claims, a refusal to enforce the state act would substantially interfere with the state's policy of providing extra safeguards for groups particularly susceptible to overreaching."
3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 601App.102[5][b](Joseph M. McLaughlin, ed., Matthew Bender 2d ed. March 1997).
As already explained, "the basic concern" animating this state's version of the Dead Man's Statute was the deterrence of perjury, as opposed to the protection of widows.

*256 XI. "Readoption" of the Dead Man's Statute

The defendants argue that even if Rule 601, Ala. R. Evid., constitutionally and validly abrogated the Dead Man's Statute, that statute was readopted when, on March 26, 1996, the Legislature approved Act No. 96-261. Section 1 of that Act specifies only that "[t]hose general and permanent laws of the State enacted during the 1995 Regular Session of the Legislature as contained in [certain specified 1995 cumulative supplements and replacement volumes of the Code of Alabama 1975] are adopted and incorporated into the Code of Alabama 1975." Section 1 had no effect on the Dead Man's Statute. Section 2 of the Act, however, states that "[t]he adoption and incorporation of the supplement and replacement volumes specified in this act shall constitute a continuous systematic codification of the entire Code of Alabama 1975 for purposes of Section 85 of the Constitution of Alabama of 1901. This act is a law that adopts a code for the purposes of Section 45 of the Constitution of Alabama of 1901."
Section 85 of the Constitution of Alabama 1901 provides that "[i]t shall be the duty of the legislature, at its first session after the ratification of this Constitution, and within every subsequent period of twelve years, to make provision by law for revising, digesting, and promulgating the public statutes of this State, of a general nature, both civil and criminal." Section 45 of the Constitution specifies certain requirements for laws enacted by the Legislature, but excepts from those provisions "bills adopting a Code." Section 3 of Act No. 96-261 declares that the Code publisher has certified the discharge of its duties to edit and publish the specified replacement volumes by "combining the material in the previous bound volumes with the material contained in cumulative supplements without making substantive changes...."
The 1995 Replacement Volume 11 was one of the specified replacement volumes, and it, comprising 961 pages, contains the entire of Title 12 of the Code, relating to "Courts." The defendants make the point that the 1995 Replacement Volume 11 contains the full text of § 12-21-163. It indeed does so, followed by the Code Commissioners note: "Cross references  For this section being commented on by new Rule 501, Ala. R. of Evid., effective January 1, 1996, see the Advisory Committee's notes to new Rule 501 in Volume 23." (The reference to Rule "501" is clearly a typographical error, because the Advisory Committee's notes to that Rule contain no comment on § 12-21-163, but rather the Rule obviously intended to be referenced is 601, the Advisory Committee's Notes to which do comment on § 12-21-163.)
Venator makes the companion argument that § 12-21-163 was again "readopted" by "2002 Ala. Act 403 (adopting the 2001 Cumulative Supplement)." That supplement did not "contain" the text of § 12-21-163, however, but simply a few case annotations. Thus, it did not represent any type of readoption or reenactment.
The parties devote much of their briefs to discussing our cases of Densmore v. Jefferson County, 813 So.2d 844 (Ala.2001); Swift v. Gregory, 786 So.2d 1097 (Ala.2000); and Ex parte State Department of Revenue, 683 So.2d 980 (Ala.1996), all of which discuss the effect on preexisting statutes and their codifications of the adoption by the Legislature of an official Code of laws. In Ex parte State Department of Revenue, 683 So.2d at 982, we explained:
"This Court has held that, by the process of adopting the entire Code, the legislature repeals any portion of the original legislation and prior codification *257 not present in that adoption. See Ex parte Coker, 575 So.2d 43 (Ala.1990). In other words, the adoption of the entire Code supersedes the original enactments and any prior codification. After this Court decided Coker, the legislature refined the codification process and began the current practice of annually codifying legislation. Under this new procedure, the Code commissioner continually reviews the manuscript of the Code and directs the Code publisher to publish replacement volumes and an annual supplement that incorporates into the Code the most recent acts of a general and permanent nature. Once the annual supplement and the replacement volumes are published, they are reviewed by the Code commissioner, who prepares an annual codification bill to adopt the replacement volumes and annual supplement. This Court, however, has not considered the question whether this process has the same effect as a codification of the entire Code for the purpose of resolving conflicts between the Code and the original act."
In Densmore, 813 So.2d at 851, we observed, after quoting the above passage, that "[a]lthough this Court found it unnecessary to discuss the annual codification process in Ex parte State Department of Revenue, the Court did note that the annual codification process was begun after this Court had decided Coker." In Densmore, the Court held that an infirmity in the manner in which legislation had been enacted was "cured by its codification as the part of the Code of Alabama 1975." 813 So.2d at 852.
The plaintiffs make the following responsive argument in their reply brief:
"Defendants' position is that the Alabama Legislature specifically re-enacts brand new statutes every time it re-adopts the Code or a new replacement volume or pocket part. This proves too much. There are probably hundreds of statutes that are still carried in the Alabama Code that have been modified or completely superseded. Defendants' position would create chaos by reviving all those statutes and requiring new court challenges to get new rulings declaring them again to be unconstitutional, repealed by implication, superseded by rule, etc., etc. This would be an intolerable burden of uncertainty and wasted effort.
"Attached to this reply brief are two pages that are Appendix II to the Alabama Rules of Civil Procedure. Listed there are 68 statutes that this Court says are `superseded by the Alabama Rules of Civil Procedure.' Id. Under Defendants' view of re-codification, all of those statutes have been re-enacted anew and are now `unsuperseded' because all those statutes are still printed in the current Code of Alabama. The Legislature and Code Commissioner have not gotten around to removing them from the Code.
"This is just one example. Every statute that has been declared to be unconstitutional has now been re-enacted by the Legislature. Does every effected [sic] litigant now have to serve the Attorney General and re-argue the position that the `new' statute is also constitutional (e.g., on the grounds that effected [sic] the `old' statute)? This would be an intolerable burden. All those who neglected to timely serve the Attorney General would be stuck with the application of the statute.
"Every statute that this Court has determined to be impliedly repealed or partially abrogated is now `magically' back in force, unbeknownst to the majority of the bench and bar. This `parade of horribles' argument could go on *258 and on. The illogic of Defendants' position is glaringly obvious."
Although the parties present provocative arguments, we need not resolve their opposing contentions, for a reason not addressed in their briefs. As noted, § 12-1-1 of the Code of Alabama of 1975 declares that any provisions of Title 12 "regulating procedure," which would include the Dead Man's Statute codified as § 12-21-163, "shall apply only if the procedure is not governed by ... any other rule of practice and procedure as may be adopted by the Supreme Court of Alabama." As previously discussed, we recognized in Ward, supra, the constitutional necessity for some limitation on the prospective field of operation of § 12-1-1. We held in Ex parte Stewart that § 12-1-1 could not prospectively apply "to the extent it would never allow a statute enacted after that section's effective date to override a rule of court," 730 So.2d at 1249, given the express stipulation in § 6.11 that rules adopted by this Court "may be changed by a general act of statewide application." Nonetheless, the full retroactive application of § 12-1-1 has never been challenged in this Court, and is not now questioned by the parties to the present proceeding.
That being the case, even if we were to take the defendant's "readoption" argument at full face value, it would be self-defeating. That is because 1995 Replacement Volume 11 not only contains § 12-21-163, the Dead Man's Statute, but also the full text of § 12-1-1. If we are to accept the defendant's position that the Dead Man's Statute was reenacted by its inclusion it in 1995 Replacement Volume 11, we must consider that § 12-1-1 was likewise reenacted so that it also has a "new" operative date, as of the March 26, 1996, approval of Act No. 96-261. That being the situation, § 12-1-1 had the effect of rendering § 12-21-163 inapplicable, because the procedure established by § 12-21-163 was by then, i.e., as of the March 26, 1996, the new effective dates of both § 12-1-1 and § 12-21-163, governed by the Alabama Rules of Evidence, effective January 1, 1996. In other words, if, as is necessary to the defendants' argument, § 12-21-163 is due to have a new, re-invigorated effective date of March 26, 1996, by virtue of its inclusion in 1995 Replacement Volume 11, then likewise so must § 12-1-1, because of its inclusion in that same replacement volume. Because Rule 601 of the Alabama Rules of Evidence was an "other rule of practice and procedure [which had been] adopted by the Supreme Court of Alabama" as of March 26, 1996, and governed the same procedure as governed by § 12-21-163, the latter could not "apply" because of the preemptive effect given the former by § 12-1-1.

Conclusion
The Alabama Dead Man's Statute, § 12-21-163, Ala.Code 1975, has been superseded by Rule 601, Ala. R. Evid.
QUESTION ANSWERED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
NOTES
[1] Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).